IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38726-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID LARUE PETTIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — A jury found David Pettis guilty of first degree premeditated murder of his wife, Peggy Pettis, who died of a drug overdose on June 25, 2018. The central issue at trial was whether Pettis had added a lethal dose of drugs to Peggy's drink the night she died, and did so with the intent to kill her.

On appeal, Pettis contends that his right to fair trial was violated when the State elicited improper opinions of guilt from witnesses on four occasions. The challenged statements included a demonstrative slide used by an analyst with the subtitle "Pathway to Premeditation," the analyst's testimony that certain digital messages were particularly interesting or "noteworthy," testimony by Pettis's daughter that she and other family members had concerns about her mother's death, and the testimony of Pettis's son that he "came to believe that [his father] had something to do with [his] mother's death." The

State responds that none of these alleged errors were preserved or rise to the level of manifest constitutional error. Alternatively, the State contends that any error was harmless.

We hold that the analyst's slide and the son's testimony were explicit or nearly explicit opinions of guilt and are therefore reviewable as manifest constitutional error. However, after reviewing the errors and the evidence, we are convinced beyond a reasonable doubt that the errors did not affect the verdict and the State has met its burden of showing that the errors were harmless beyond a reasonable doubt. We affirm Pettis's conviction and sentence, but remand to strike the victim penalty assessment (VPA) and DNA fees from his judgment and sentence.

BACKGROUND

The State charged David Pettis with first degree premeditated murder of his wife, Peggy. At trial, the State's theory was that Pettis was dissatisfied with his long-term marriage to Peggy and had reconnected with an old girlfriend, Robin,[1] from New York. The State asserted that as Pettis's relationship with Robin intensified, Pettis began laying the groundwork to murder his wife, collect the proceeds from several life insurance policies, and move to the east coast with Robin. The State alleged that on the night Peggy died, Pettis ground up a lethal dose of hydrocodone and mixed it into an ice cream

---

[1] Robin's full name is not relevant for purposes of this appeal. We use her first name in this opinion. Her full name remains as part of the record.

drink he made for Peggy. It is undisputed that Peggy died on June 25, 2018 of a drug overdose.

Pettis denied killing his wife. During two interviews with police following Peggy's death, Pettis insisted that he was honest with Peggy about his relationship with Robin and did not plan to leave Peggy. Pettis alleged Peggy had dementia, had been suffering chronic pain from prior injuries, and frequently ground up hydrocodone and added it to her ice cream. He told police that on the night she died, Peggy crushed up pills and added them to her drink. He then suggested that Peggy caused her own death, either accidentally or intentionally.

*Additional Background*

Because we conduct a harmless error analysis, we set forth a more detailed summary of the evidence introduced during the seven-day jury trial.

David and Peggy Pettis had been married for 33 years. Peggy drove a school bus and Pettis was self-employed, owned a tow truck and a log truck, and operated a small pig farm in Cheney. The Pettises had three adult children: two biological children, David William[2] and Elizabeth Culp, and a nephew, James Beckley, that they treated as a son. David William lived with his fiancé, Tawnya Ibach, on the south hill in Spokane and

---

[2] Because many of the witnesses share the same last name as the appellant, we refer to the appellant by his last name. For purposes of clarity, we use the first name of Peggy and David William. No disrespect is intended.

3

talked to his mother regularly.  Culp lived nearby in Cheney.  Peggy's sister, Melissa

Mabe, and her family lived next door to the Pettises in Cheney.  In addition, Bill Porter,

who had raised David Pettis, and his current wife Nancy, had been living with the

Pettises for approximately a year at the time of Peggy's death.

The Pettises' relationship was described as average, but in the months before her

death, several people noticed Peggy exhibiting a more somber mood.  Nancy Porter

noticed that Peggy seemed to be more stressed and thought it might be related to the

family's finances.  Bill Porter also observed that Pettis was harsh with Peggy.  David

William indicated that his parents' relationship became hostile and likewise assumed it

was due to finances.  In the months preceding his mother's death, David William noticed

his father snap and yell at his mother more often.  Tanya Ibach also noticed that the

Pettises' stress increased after Pettis reconnected with Robin.

*Pettis's Relationship with Robin*

In November 2017, the year preceding Peggy's death, Pettis reconnected with

Robin, a woman he dated in high school, while he was in New York for a funeral.  Robin

invited Pettis to sleep on her couch while he was in town.  During this stay the

relationship became intimate although Robin expressed reservations because she knew

Pettis was married.

Following this trip, Robin and Pettis continued to communicate through various

digital media including texting, email, and social media.  Within weeks of visiting Robin

in New York, Pettis sent her an email in which he talked about bringing her to his farm. He also asked for Robin's ring size and indicated that he is "building a kingdom," that he needs a "special person" to help him with it, and that he wanted that person to be Robin. Ex. P-60. Pettis claimed his marriage was dissolving and his sex life had "all but disappeared." Ex. P-60. He ended the email by indicating that "[t]here will come a day in the not so distant future I will be on my knee in front of you." Ex. P-60.

Peggy became aware that her husband was communicating with Robin. Nancy testified that Pettis would be in his home office while Peggy and Nancy were in the living room and Nancy could hear Pettis call Robin "sweetheart," say "I love you," and "I can't wait to be with you." Rep. of Proc. (Nov. 30, 2021) (RP) at 459. When this occurred, Peggy would just "shrink down like there was nothing left . . . that she could give" or that Pettis wanted from her. RP at 459. Despite this reaction, Nancy testified that there was no indication that Peggy would hurt herself.

Contrary to Nancy's testimony, Culp testified that Robin was friends with both of her parents. Culp indicated that her mother was not concerned about Pettis's relationship with Robin. Peggy told Culp that she was "thankful that if something happened to her, that Dad would have Robin because Dad was not the type of person that could survive alone." RP at 1000. However, Culp also testified that Pettis described his relationship with Robin as friendly, not intimate.

5

In February, Pettis took a second trip to New York. Although Pettis returned home early, he sent Robin a message within days, complaining that Robin's refusal to answer his texts was causing him anguish and "it is becoming clearer and clearer to me that you mean everything to me. I never knew I could ever feel this connected to someone. . . . [P]lease don't shut me out I couldn't take the thought of losing you, not again." Ex. P-10 at 1186. On March 18, Pettis sent Robin another message professing his love for her and anguishing over the thought of losing her.

On March 22 and 23, several messages were exchanged between the social media accounts of Pettis, Robin, and Peggy. The details of these messages are set forth below, but the State's analyst opined that several messages sent from Peggy's account to Robin were actually written by Pettis.

*Peggy's Health*

Pettis's defense at trial was that Peggy crushed up the lethal dose of hydrocodone and placed it in her own drink the night she died. Evidence at trial focused on how frequently Peggy took hydrocodone, whether she needed them crushed up, and whether she was starting to develop dementia.

In 2016, Peggy had a farm accident where she landed on a boar that gouged her thigh. At the time of the accident, Peggy was prescribed 45 tablets of hydrocodone with directions to take one every four hours. Although the wound healed, the injury caused a

limp and chronic pain. Despite this pain, Peggy was able to continue working as a bus driver and continue working around the farm and in her garden.

The witnesses at trial had contrasting views on how Peggy managed her chronic pain. Mabe, testified that Peggy generally managed the pain with Tylenol. Mabe also testified that Peggy did not like taking hydrocodone because it made her itch and feel "muzzy-headed." RP at 287. When she did take hydrocodone, she would take it with Benadryl to relieve the itchy feeling she got from taking the hydrocodone. David William testified that his mother would take Tylenol and ibuprofen for the pain and he never saw her on any opioid pain medication. Nancy Porter said she knew Peggy took hydrocodone when her leg was bothering her, usually when she was going to bed, and Pettis would remind her to take her medication.

On the other hand, Culp testified that her mother had been taking two hydrocodone on the weekends for years. Culp testified that Peggy did not take the pills when she was working during the week. When asked where Peggy obtained these pills, Culp explained that Peggy took some of the hydrocodone from Peggy's former mother-in-law after she died in 2014. When it was pointed out that four pills every weekend for four years would amount to around 800 pills, Culp said it was possible that Peggy took that many pills from her former mother-in-law's home.

The witnesses also disagreed on whether Peggy could swallow pills whole or needed to crush them up. During his interview with police, Pettis told detectives that his wife crushed the pills up.

Culp, who had lived with her parents several years prior to Peggy's death, testified that her mother could swallow smaller pills but would grind up larger pills like hydrocodone with a coffee cup and put them in pudding. Culp admitted that in an interview after her mother's death, she told law enforcement that she was unaware of her mother grinding up her medications and that she was not aware of her mother having any problems swallowing. She testified that after the interview she remembered her mother would occasionally have coughing attacks after taking a sip of water. One witness, called by the defense, confirmed that they had witnessed Peggy grind up her pills on one or two occasions and put it into ice cream.

The State introduced several witnesses who testified that they observed Peggy take medication whole, without having to grind it up. This included Mabe, David William, Ibach, and both of the Porters. In addition, a bus driver who had worked with Peggy and had known her for 20 years, stated that she had observed Peggy take full tablets of Tylenol. This witness also testified that she did not witness or hear Peggy express any problems with choking or gagging.

Prior to Peggy's death, Pettis told several people that Peggy was exhibiting the signs of Alzheimer's or dementia. In an interview with police shortly after Peggy's

death, Pettis told detectives that Peggy had memory issues or dementia. As examples of her memory issues he told police about bills that were not paid and an incident in which he watched Peggy grinding up several days' worth of pills for their dog. Pettis also indicated that shortly before her death, Pettis and Peggy had discussed their conclusion that Peggy had early onset dementia with Peggy's physician's assistant (PA), Carol Gahl. Pettis told detectives that PA Gahl told them that Peggy did not have Alzheimer's but suggested she had normal memory loss and recommended that Peggy do puzzles to strengthen her memory.

At trial, the State introduced evidence to dispute this claim. Nancy Porter testified that Pettis told her that Peggy's dementia made her forget to pay an electric bill. But Nancy believed that it was lack of funds, not memory, that cause the bill to go unpaid. Nancy did not observe any signs that Peggy had dementia. Likewise, Bill, observed Peggy become increasingly quiet but did not attribute this to memory loss or dementia. Ibach testified that six months before Peggy's death, Pettis drove to her place of work and indicated that Peggy was suffering from dementia. Ibach testified that she never witnessed any signs of dementia in Peggy.

*Pettises' Prescription History*

The State introduced the testimony of the pharmacy manager where the Pettises filled their prescriptions. The pharmacy manager testified that in the last 17 years, since 2001, Peggy had filled eight prescriptions for hydrocodone. The two most recent

prescriptions were for 45 pills in May 2016, the month she was injured by the boar, and

12 pills in February 2018, four months before she died. For the last prescription, she was

instructed to take one-half to one tablet up to "three times a day, as needed for pain." RP

(Nov. 30, 2021) at 898. Aside from hydrocodone, the pharmacy manager only had a

record of a few pain relievers seeming to be affiliated with dental appointments for

Peggy. The pharmacy manager did not have any records of Peggy filling prescriptions

for cyclobenzaprine or trazodone.

On March 10, 2018, Pettis saw PA Gahl and complained of shoulder pain. He

informed PA Gahl that he had been taking his wife's hydrocodone. Following this visit,

he was prescribed 24 tablets of hydrocodone. Aside from the hydrocodone, Pettis had

been prescribed 90 tablets of trazodone, a sleep aid, in September 2015. In addition, he

had been prescribed cyclobenzaprine, a skeletal muscle relaxant, in March and June

2018. All three substances were found in Peggy's system during the autopsy.

The pharmacy manager testified that Pettis filled a prescription for sildenafil,

erectile dysfunction medication, in January 2018 for 20 pills and again in July 2018 for

50 pills.

*Life insurance policies*

The State produced evidence at trial that at the time of Peggy's death, there were

three insurance policies on her life naming Pettis as the beneficiary. Peggy had one life

insurance policy through her employer for $250,000 that had been in effect since 2002.

10

This policy would cover death from an accident, including drug overdose and suicide. After Peggy died, Pettis contacted this company in August 2018 and said he was not going to make a claim.

In the months preceding Peggy's death, the Pettises applied for two additional life insurance policies covering Peggy. During that time, Nancy Porter remembered Pettis asking Peggy regularly, if not daily, if she had called to get the life insurance. On March 22, 2018, an application for life insurance was submitted to Protective Life for Peggy with Pettis as the beneficiary. After Peggy's death, Pettis told police that he did not apply for his own policy because his weight was too high. The Pettises' insurance agent testified that Pettis did not apply for his own insurance because he was taking hydrocodone for an injury and this would significantly increase his premium. The insurance agent recommended that after he was off his medication for 30 to 60 days, he could apply for insurance.

Protective Life required Peggy to get a physical before issuing its policy. On June 5, Peggy and Pettis attended a medical examination by PA Gahl. PA Gahl noted that the visit was "interesting." RP at 878. While Peggy appeared relaxed, Pettis appeared somewhat anxious and stressed, indicating that it was urgent that the paperwork for the examination be completed that day. Throughout the visit Pettis claimed Peggy had memory issues, that she often forgot to pay the bills, and would interject when Peggy would start to deny the allegation. The PA did not find any evidence of dementia or

11

Alzheimer's. Nor did the PA have any memory or notes about recommending puzzles or explaining the difference between Alzheimer's and dementia.

During the examination, Peggy indicated that she would occasionally experience pain in her back and hip. The PA was aware that Peggy had a prescription for hydrocodone filled in February, but this was not a concern. Despite the pain in Peggy's back, the PA was able to easily get her into the correct position for the exam. When asked what she took for the pain, Peggy indicated that she would occasionally take Tylenol.

Peggy passed the physical and on June 22 an email was sent to Pettis's email address notifying him that the policy was in force as of that afternoon. The insurance agent received a response email the next day that stated: "'Thank you for putting up with me and all your help. Are you ready—are you ready to see what you can find for coverage for me? I currently weigh 280 but working on being 225 by November with the hopes of being off BP'—which is blood pressure medications—'and my CPAP. A big hurdle might be I have PTSD,[3] Dave Pettis.'" RP at 803.

In an interview with detectives on October 17, Pettis denied seeing the email notifying him that Peggy's policy was effective on June 22.

---

[3] Posttraumatic stress disorder.

12

The Pettises also obtained a life insurance policy from AIG on Peggy that was issued on June 6, 2018, for $150,000, naming Pettis as the beneficiary. Pettis called to make a claim on this policy on June 27, two days after Peggy died. The claim was denied because the policy did not cover suicide or accidental overdose.

*Evidence of Pettis's plans to move to New York*

On March 22, the same day that Peggy applied for a life insurance policy, Pettis placed an ad "testing the water" to sell the farm. RP (Nov. 30, 2021) at 1193. Culp sent a screenshot of this ad to Peggy stating that "[she] thought this was a in-a-few-years thing, not right now," to which Peggy responded, "I thought so too." RP (Nov. 30, 2021) at 1193-94.

In May, Pettis and Robin began discussing houses for sale in New York. Robin sent Pettis a list of things she would like, including a window over the kitchen sink and a bedroom big enough "so the dogs can sleep with me," to which Pettis replied, "us," and Robin responded, "yes sorry us." Ex. P-10 at 1654. Robin also sent Pettis employment ads for jobs in New York.

That same month, Pettis contacted a woman who was selling her home, and indicated his earliest time frame was August but suggested he would see if he could move up the sale of the farm. He asked for pictures of the window over the kitchen sink. When the woman later responded that she was listing the property, Pettis responded on

13

June 21 that he was "[h]oping [to] be there next month," and, "wish I could get there sooner." Ex. P-10 at 1856.

*Peggy's Death*

On June 25, the night of Peggy's death, the Pettises and the Porters had dinner together. After dinner, Pettis asked if Peggy wanted ice cream or an ice cream soda. Nancy testified that this was unusual because Pettis would normally tell Peggy he wanted ice cream and she would get it for him. Peggy had been sitting in her lift chair and Pettis went to get the ice cream and brought it to her. Nancy stated that she noticed it looked like an ice cream soda and that Peggy drank the whole thing. At some point later that evening, Peggy looked gray, sick, and tired. Peggy went to bed around 6:30 or 7:00, which was a little unusual for her. Although Peggy looked tired before dinner, it was not until after dinner that Nancy noticed she looked gray. The Porters stayed in the living room for another half hour, then went to their bedroom to watch television.

At approximately 10:35 p.m., Pettis called 911 to report that his wife was unconscious. First responders arrived a few minutes after the call and were met outside by Pettis. The first responders found Peggy partially in the bathroom and the bedroom, on her back, and unresponsive. As the first responders were providing aid, Pettis asked what the probability of life would be in her current condition. During attempted aid Pettis then asked the first responders to call off further resuscitation and to cease efforts. At this point, Peggy was declared deceased.

14

A deputy sheriff arrived on scene and began asking Pettis questions. Pettis informed the deputy that earlier in the evening Peggy had taken 10 mg of hydrocodone. He stated this was from a prescription she had from an injury she received approximately three years prior. He informed the deputy that she had "one vodka-based beverage" with the one pill. Both had apparently gone to bed and he could not fall asleep so he went to the living room around 8:30 p.m. Around 10:30 p.m., after falling asleep on the couch, he went into the bedroom where he said he found Peggy face down on the floor. He explained that he found her foot wrapped up in the blanket and water was spilled on the floor. At this point, he rolled her over and dragged her into the bathroom so he could perform CPR. He informed the deputy that a clear liquid came out of her mouth when he was attempting CPR, which he thought was water.

The deputy later testified that he did not observe any blankets that appeared to be tangled or hanging off the bed. Pettis showed the deputy the lock box in the bedroom where Peggy kept her medication. Inside the lock box the deputy found a few loose pills and a prescription bottle for Pettis with one remaining hydrocodone. Another hydrocodone with a different imprint was found loose in the box as well as seven 50 mg trazodone pills in a Ziploc bag that Pettis claimed to have received from a friend. There were no prescriptions in Peggy's name located in the home.

15

After Peggy passed, Ibach cleaned the house and found the pill grinder in the kitchen. She thought it was odd that it was in the kitchen because Peggy always kept the pill grinder in the bathroom.

*Events Following Peggy's Death*

Following Peggy's death, family members began contacting the medical examiner's office and law enforcement. Mabe contacted law enforcement three days after Peggy's death. After hearing from her, law enforcement decided to conduct an additional interview with Pettis.

In the days after Peggy's death, Pettis made several phone calls to the medical examiner. On June 26, 2018, Pettis asked when the results would be available and asked if she had aspirated on water. On July 2, Pettis contacted the office again explaining that Peggy had early on-set Alzheimer's and he thought she may have taken a second dose of medication. During this same call, he asked if there was anything that could be done to speed up the results because he needed to receive the life insurance money and bury Peggy. The medical examiner received a call from Pettis again on August 28, 2018 wanting to know the cause and manner of Peggy's death. Pettis was unhappy when he was informed it would take longer due to staff being out of the office. Pettis called again on September 6, 2018 asking if there was a cause and manner of death and once again became upset when he was told it would be a few more weeks.

In September 2018, Pettis contacted law enforcement letting them know his frustration because he was unable to access any of the life insurance policy money, he was unable to pay for funeral expenses, and that everything was taking too long. Law enforcement contacted Heritage Funeral Home and was told that expenses related to Peggy's burial had been paid on July 6, 2018.

*The Medical Examiner's Cause of Death*

The medical examiner who performed an autopsy on Peggy testified at trial. He explained that bruising and compressions on Peggy's face indicated that she was lying face down with the right side of her face against a hard surface when she died and for some time thereafter. Although there was a sign of aspiration, the examiner stated this would be typical right at the time of death but would not cause the death.

The toxicology report detected hydrocodone, cyclobenzaprine, diphenhydramine, trazodone, and acetaminophen (commonly known as Tylenol) in Peggy's system. The cyclobenzaprine, diphenhydramine, trazodone, and acetaminophen were all detected at levels that would individually be considered therapeutic and nontoxic, however, the hydrocodone was at a level that is known to be lethal by itself. In his opinion, "the death was caused by the hydrocodone toxicity [ ] in combination with the presence of the other drugs or the exposure to the other drugs." RP (Nov. 30, 2021) at 496. He was unable to determine how many hydrocodone pills would have yielded this result. Ultimately, the

17

medical examiner could not opine whether Peggy knowingly or unknowingly ingested the medications.

### Pettis's Several Versions of Peggy's Death

Pettis told different versions of how Peggy died to several people. He told first responders on the scene that Peggy took one hydrocodone with a vodka-based beverage earlier that night. Pettis also told them that he went to bed with Peggy but could not sleep so he went back out to the couch and fell asleep. He woke around 10:30 p.m. and found Peggy lying face-down on the floor with her foot wrapped in a blanket and water spilled on the floor.

Four witnesses testified that Pettis admitted to them that he crushed up the hydrocodone pills and placed them in Peggy's drink the night she died. Ibach testified that Pettis told her and Culp that the night Peggy died he had crushed up hydrocodone and put it into her ice cream. Culp substantiated this.

David William testified that his father's story changed several times in the two weeks after his mother's death. At first Pettis told him she took a hydrocodone and went to bed. Next, he told David William that she had a drink and a hydrocodone, and then went to bed. And then it was that she had ice cream and alcohol and went to bed. Finally, it was that he crushed up some hydrocodone, put it in the ice cream, and gave it to Peggy.

18

Pettis told Robin that after Peggy went to bed he fell asleep in the living room, and when he woke up, he found Peggy face down on the floor near the bathroom. Pettis informed Robin that he would often grind up her pills and make ice cream floats with peach flavored alcohol and that on the night she died, he ground up her pills.

Pettis told Bill and Nancy that Peggy had aspirated on water. Pettis also informed Mabe that he thought Peggy may have had a heart attack because he was taking a nap, heard a thump, woke up, and found her on the floor tangled in the sheets. Within 15 minutes after telling this story, he told Mabe she might have overdosed on hydrocodone.

Pettis also spoke with Sandra Brantley, Peggy's co-worker, the morning after Peggy's death and explained that he felt her get out of bed, and once he discovered she had not come back, he found her lying on the floor. Another woman, who Pettis met on an online dating website, testified that she spoke with Pettis about a month after Peggy's death and that he told her that his wife had aspirated on water.

*Pettis's Interviews with Police*

Following Peggy's death, Pettis gave two interviews with law enforcement. In his first interview, approximately three weeks after Peggy's death, he told detectives that Peggy had early onset dementia. Pettis also told detectives that Peggy was taking hydrocodone for pain in her leg and it "got to the point where she was taking three at a time." Ex. P-26 at 11:34:25. Pettis indicated that Peggy had her own prescription and would use his prescription pills as well, but did not mention any other prescriptions in the

19

house.  Pettis told detectives that on the night Peggy died, she crushed hydrocodone with a pill grinder, mixed it with rum, and added it to an ice cream float.  He suspected that this caused her death.  Pettis told detectives they were married for 33 years, there had never been a harsh word between them, and they were best friends.

When Robin's name was brought up during this interview, Pettis said she was his best friend from high school in New York.  He told detectives that Peggy knew he talked to Robin and it was Peggy's wish that if anything happened to her, Pettis should be with Robin.  He also indicated that he and Peggy had plans to sell the farm and move back to New York together.  Toward the end of the interview, Pettis told detectives that no one would ever murder Peggy because she was too nice and she would never commit suicide because she was never depressed.

The second interview was conducted on October 17, about four months after Peggy's death and the same day that police executed a search warrant on Pettis's home. Detectives questioned Pettis about the drugs Peggy was taking.  They told Pettis that the toxicology report indicated there was no alcohol in Peggy's system, but ten times the amount of therapeutic hydrocodone.  When asked, Pettis said the night before she died, Peggy took trazadone with the hydrocodone but it gave her a hangover and she indicated she would not do that again.  When detectives told Pettis that there was trazadone in Peggy's system, Pettis denied having a prescription for trazadone and claimed he got a few pills from a friend.  When confronted with the high number of hydrocodone pills he

20

claimed Peggy was taking on a regular basis, Pettis mentioned that when Peggy's former

mother-in-law died, Peggy took three 90-count bottles of hydrocodone from her home.

Later in the interview, Pettis denied grinding up Peggy's pills or putting them in her drink

on the night she died. Instead, he insisted that Peggy brought out ground up pills and she

put them in her drink.

Pettis also told detectives that he had talked to Robin only a couple times since

police questioned her the month prior. When Pettis described his interactions with

Robin, he said that he was completely honest with Peggy about his contacts with Robin.

Pettis indicated that when he visited Robin in March, Robin showed him a message from

Peggy to Robin indicating that if anything ever happened to her (Peggy), that Pettis could

be with Robin.

When confronted about his inconsistent claims that Peggy was his better half but

he admittedly had an intimate relationship with Robin, Pettis said his relationship with

Robin happened in November and he felt so guilty that he came home early and told

Peggy everything. He said that after November he put the brakes on his relationship with

Robin and nothing ever happened. Still, Pettis said Peggy and Robin communicated

constantly over the next several months.

When asked about filling prescriptions for erectile dysfunction after coming back

from New York and within weeks after Peggy's death, Pettis said the medication was

21

recommended by his doctor because his weight was causing blood loss to his testicles.[4]

Pettis claimed that when he went to New York, his pills stayed home. When asked about searches on his computer for the effects of hydrocodone, Pettis said that Peggy had entered this search and said he now suspected that Peggy was suicidal because she was in so much pain.

*Charges, Pretrial Motions, and Proceedings*

One year after Peggy's death, David was charged with first degree premeditated murder. The State advised the court that it anticipated introducing voluminous records and moved in limine for permission to call two expert witnesses who would help the jury interpret and summarize these records. The proposed summaries concerned financial records and digital communications. The State indicated the communication records consisted of approximately 2100 pages and would be presented through the testimony of an analyst named Mark Voigtlaender. At the hearing, the State indicated that it was still working with defense counsel to see if the parties could agree on what evidence was admissible.

---

[4] The doctor who prescribed these pills testified at trial that Pettis asked for them to address erectile dysfunction and the doctor had never heard of the explanation Pettis gave to law enforcement. RP at 708-09.

*Testimony at Trial*

On appeal, Pettis contends that several witnesses provided improper opinions of his guilt. Specifically, he challenges four portions of testimony: 1) Voigtlaender's slide subtitled "Pathway to Premeditation," 2) Voigtlaender's inference that Pettis was an "insider threat" as well as testimony that certain messages were "interesting" and "noteworthy," 3) David William's testimony that he had come to believe his father had something to do with his mother's death, and 4) Culp's testimony that her mother's family had suspicions and she had curiosities about her mother's death.

Voigtlaender testified at trial that he was the data analyst and "supervisor for the regional intelligence group for the Spokane County Sheriff's Office." RP (Nov. 30, 2021) at 714. He became involved with this case when he was asked to aggregate and analyze data related to the case such as cell phone records, emails, and social media information. To summarize his analysis, he prepared a slide presentation that was used as a demonstrative exhibit for the timeframe of events and used at trial without objection. One of the slides was titled "Timeframe of Events" with a subtitle "Pathway to Premeditation." Br. of Resp't, Ex. P-12, at 2. Other than this subtitle, the analyst did not use the word "premeditation" in his testimony.



Br. of Resp't, Ex. P-12, at 2.

Voigtlaender testified that he aggregated data between November 2017 and the summer of 2018, with several cutoff points in June, July, and August. The significant spots he noted in the presentation were from November, January, March, and June. Specifically, he looked at communication between Pettis and Peggy and between Pettis and Robin.

Voigtlaender testified that based on his analysis of these messages, it appeared that Pettis was sending messages to Robin using Peggy's social media account. To support this opinion, he pointed to messages from November 2017 to show that Peggy generally communicated with small words and single sentences. He also noted specific communications from January 2018, where Pettis admitted that he was using Peggy's account to communicate with another person.

24

Voigtlaender pointed to three messages from March 2018 that suggested Pettis was using Peggy's account to communicate with Robin. The first message to Robin was sent on March 13, shortly after Pettis returned from New York, where Peggy's account says:

> Me too. He is a train wreck. Robin, he is so in love with you and petrified of losing you. I know there's a connection between the two of you and that's a good thing. We both love this old man a lot. I am so glad the two of you have reconnected. I know it might be weird, but I would rather share his—this than lose his love.

RP (Nov. 30, 2021) at 733.

Voigtlaender opined that this was the first message from Peggy's account that did not appear to be written by her. To support this opinion, he pointed to specific words commonly used by Pettis and Peggy. He also pointed out that the comment from a purported wife about sharing her husband was noteworthy.

Voigtlaender also opined that a message from Peggy's account to Robin, sent on March 18, 2018, was from Pettis. This message read:

> He is hurting bad. He has lost so much in the past month and dealt with so many emotions. He is at a point where he needs you the most. Robin, I know you love him and I know your [sic] in love with him and that's okay. It gives me comfort knowing that when I'm gone, he has a fishing buddy and someone to love him. When the two of you were talking every day, he always had a smile on his face. Lately I don't know who he is.

RP (Nov. 30, 2021) at 735. To support his opinion, Voigtlaender compared references to "fishing" throughout the collective communications, and noted that of the 50 instances,

25

49 were Pettis mentioning fishing in his Facebook messages, but this had been the only time fishing was mentioned by Peggy.

Voigtlaender testified that another notable transition was the next part, "when I'm gone, he has a fishing buddy," which, when compared to the previous message about sharing Pettis, indicated a mental shift from sharing to an expectation of being gone. Voigtlaender pointed to the grammatically incorrect use of "your" that was used in the same incorrect context in another message that Pettis messaged to someone else.

The third exchange of messages that Voigtlaender considered noteworthy occurred on March 23 between Peggy's account and Robin. Voigtlaender testified that earlier that evening Robin had responded negatively to receiving a nude photograph from Pettis. Pettis asked Robin to call him but she did not respond to Pettis, instead contacting Peggy on social media and asking Peggy to call her. Peggy's account responded that she was not feeling well and did not want to call, but the messaging between the two continued.

Voigtlaender then read the following exchange of messages:

[Peggy's account]: I think [Pettis] was looking forward to talking to you tonight.
. . . .
[Robin]: He is too needy for me to deal with when my head hurts. I don't know what is going on in his head, but he needs to realize that he needs to upfix himself and get happy with life and come to terms with the fact that I'm not the answer to his happiness. I just need to rest my head against the back of the recliner in a dark room. I told him to call me on the phone.

26

. . . .

[Robin]: [Pettis] is the biggest pain of all.

. . .

[Peggy's account]:  Wow.  I thought you loved him.

. . . .

[Robin]:  Do not know how you dealt with him being emotional all these years.

[Peggy's account]:  He has his moments but he is a good man. . .  He never had issues until the mugging.  It messed him up.

[Robin]:  I loved him.  I am not in love with him.  If he had pulled that sick, old, poor me routine with me, our intimate touches would probably not have happened.  I love him as a best friend.  I don't think he has realistic expectations of me.

. . . .

[Peggy's Account]:  He really changed when you got distant.  He said you don't even do words with him anymore.  I will talk to him, but if he loves you as much as he me, you're special.  Oh, poor me.

. . . .

[Robin]:  I know he really has traumatic damage from the mugging.  I really want to be here for him.  I just can't consider him—or I just can't consider being a homewrecker in your family's eyes.

. . . .

[Peggy's account]:  PLEASE DO NOT CONSIDER YOURSELF A HOMEWRECKER!!!!  He loves you and he loves me too, and I am good with that. If something happens, I need to know that he will be looked after and I think you're the best choice for that.

. . . .

I think you love him more than you're letting on, even though he's a pain in the ass and that's okay.

I just snuck a look at his phone and I don't see where you told him to call. Maybe you forgot to hit send.

. . . .

Well, I'm headed to bed too. Love you and I'm sure he does too. Sleep tight.

RP (Nov. 30, 2021) at 740-744.

Approximately one minute after this last message from Peggy's account, Pettis messaged Robin, "Good night. Love you." RP at 744.

Voigtlaender testified that several details suggested Pettis was using Peggy's account on this night. He also pointed out that Peggy's account mentions, "if something happens," which is different from the first message that suggested sharing Pettis and the message on March 18 which mentions "when I'm gone." RP at 745.

As Voigtlaender was explaining that Pettis seemed to be exhibiting distraught behavior, he began to testify that Pettis "was in a mindset where—," when the court sustained defense counsel's objection. RP at 831-32.

The prosecutor then turned to the significance of transitions pointed out by the analyst.

So one thing that's—that's interesting that I've used in other investigative arenas, whether it be—particularly, let's look at counter-intelligence move: When someone is an insider threat and decides to do harm to people that they have sworn to uphold or love, and that person then does something violent, we look at patterns of what changes, if there's something in the way they communicate that communicates where their mindset is, particularly if it's around a time stamp or time frame where there's a lot of

emotional upheaval, are there phrases, are there indications of what that individual is looking at or what they're doing.

To me these three conversations, that—the phraseology, the timing, the internet protocol addresses, and the type of conversation that was being committed at those times—or that was being made on Peggy's account seem to fit a time where there was—particularly with these phrases, the first message a wife was saying to a potential lover that I'm willing to share my husband with you. The second message was that when I'm gone, which is a transition from sharing to saying he's all yours. And then to the third, if something happens. So that progression from those three messages, that looked to be from [Pettis], became a significant item of potential consideration in this trial.

RP (Nov. 30, 2021) at 832-33. Voigtlaender described the messages as "noteworthy," especially in light of what else was happening. However, when he began to explain that this included Pettis's mental and emotional state, defense counsel's objection to narrative was sustained and Pettis's state of mind was not raised thereafter.

Pettis also challenges portions of David William's and Culp's testimony. During David William's testimony, the following exchange took place in which he was asked whether he expressed concerns about his mother's death to law enforcement:

Q  And regarding that conversation, did you express to law enforcement your concerns about the death of your mother?

A  Yes, I did.

Q  What were those concerns?

A  That there was something else. I wanted to know the truth of what happened to Mom.

Q  And did you come to develop a belief, based upon the information you
   received from law enforcement?

A  Yes

Q  And what's that?

RP (Nov. 30, 2021) at 337-38.  Immediately after this line of questioning defense counsel

objected to speculation, which the judge overruled.  David William answered the

question by stating "I came to believe that my dad had something to do with my mother's

death."  RP (Nov. 30, 2021) at 338.

A detective assigned to the case indicated that he began investigating the Pettises'

life insurance policies and medical records after an interview with Pettis on July 10, and

then spoke with family members who "raised some issues that made it appear

suspicious."  RP (Nov. 30, 2021) at 587-88.

During Culp's testimony, the State asked her whether she remembered her

interview with law enforcement following her mother's death:

Q  at that point did you know that there were suspicions about the death?

A  I knew that my mother's family had suspicions.

Q  Just your mother's family?

A  My mother's family, yes.

Q  You actually – you – you made a call in the days after she died with
   suspicions, correct?

A  My family had given me cause to have curiosities.

Q  Just your family?

A  My mother's family, yes.

Q  Okay.  What about your dad?

A  No.

Q  So nothing that your dad said --

A  My dad was --

Q  -- to you --

A  My dad was grieving. Everybody reacts to grief differently.

Q  Do you recall contacting the medical examiner's office?

A  Yes, I do.

Q  Okay.  Do you recall having a conversation with one of the persons who returned your call?

A  To my recollection, my question to them was, "If a family had concerns, then what would we do about it?"

Q  Do -- do you recall saying that you had concerns about the death?

A  I do not recall saying that myself.  No.

Q  Do you recall saying that your dad had been making statements since the death such as that he had to crush the hydrocodone and put it in her ice cream for her to swallow them?

A  I may have said that.  Yes.  I know my dad did that night.

Q  So that night, the night that she died, he crushed up her hydrocodone and put them in her drink for her?

A  That's what I was told, yes.

Q  By your dad?

A  When I had the conversation with him, yes.

RP (Nov. 30, 2021) at 981-92.

Finally, the State elicited testimony from the medical examiner that he had spoken with Culp and documented her concerns and advised her to file a police report.

31

ANALYSIS

Pettis contends that he was denied his constitutional right to a fair trial by an impartial jury when the State elicited improper opinions of guilt from several witnesses. The State responds that Pettis failed to raise an appropriate objection to any of the challenged evidence. Because the errors were not preserved, the State contends that they are reviewable only if they rise to the level of manifest constitutional error. While acknowledging that Voigtlaender's slide was improper, the State argues that Pettis fails to establish a manifest error and any such error is otherwise harmless.

1.      STANDARD OF REVIEW

Our standard of review depends on whether the alleged errors were preserved at trial. Pettis does not contend that he preserved his challenges to the opinion testimony of family members, but he argues that defense counsel repeatedly objected to Voigtlaender's improper testimony. When Voigtlaender was testifying, Pettis raised two objections, one for "speculation" and one for "narrative." Both objections were related to Voigtlaender's testimony about Pettis's state of mind and both objections were sustained. These objections did not preserve the issue raised on appeal: whether the witness was providing an improper opinion of Pettis's guilt.

Requiring preservation through objections "serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials." *State v. Lazcano*, 188 Wn. App. 338, 356, 354 P.3d

233 (2015). Here, defense counsel's objections did not apprise the State or the court of any claim that the witness was providing improper opinion testimony, much less provide an opportunity to correct the alleged error. Because this was not the specific objection at trial, Pettis did not preserve the issue of improper opinion testimony. *See State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985) (noting that a party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial).

We generally decline to review errors that were not preserved at trial unless the defendant can establish a manifest constitutional error. *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009); RAP 2.5(a). This rule comes from the principle that defense counsel is obligated to seek a remedy as errors occur or shortly thereafter. *Id*. at 98.

2.    MANIFEST ERROR

Pettis argues that even if he failed to preserve the issue below, the admission of improper opinion testimony from the data analyst and family members is reviewable as manifest constitutional errors. The general rule for waiver includes a narrow exception when the claimed error is a "manifest error affecting a constitutional right." RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). To determine whether a manifest constitutional error exists courts will apply a four-step process:

> (1) We first determine whether the alleged error is in fact a constitutional issue; (2) next, we determine whether the error is manifest, that is, whether it had "practical and identifiable consequences"; (3) we then address the

merits of the constitutional issue; and (4) finally, we pass upon whether the error was harmless.

*State v. Barr*, 123 Wn. App. 373, 380, 98 P.3d 518 (2004) (quoting *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

Looking at the first factor, Pettis asserts that Voigtlaender and certain family members provided improper opinion testimony of his guilt. If true, the alleged error is constitutional. A witness's opinion on the defendant's guilt invades the province of the jury and can implicate a constitutional right. *See State v. King*, 167 Wn.2d 324, 331, 219 P.3d 642 (2009); *Barr*, 123 Wn. App. at 380-81.

Next, we must determine if the alleged errors are manifest. Constitutional error is not necessarily manifest error. *Kirkman*, 159 Wn.2d at 934-35. Instead, manifest error is a narrow exception to the general rule of waiver. *Id.* at 935. "Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error." *Id.* at 936. "But, 'an explicit or almost explicit' opinion on the defendant's guilt or a victim's credibility can constitute manifest error." *King*, 167 Wn.2d at 332 (quoting *Kirkman*, 159 Wn.2d at 936).

Thus, in order to demonstrate manifest error, Pettis must show that the witnesses provided explicit or nearly explicit opinions of guilt. "Whether testimony constitutes an impermissible opinion on guilt or a permissible opinion embracing an 'ultimate issue'

34

will generally depend on the specific circumstances of each case." *City of Seattle v.*

*Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

> To determine whether statements are impermissible opinion testimony, a court will consider the circumstances of a case, including, "(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact."

*King*, 167 Wn.2d at 332-33 (internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 928).

Not all opinion testimony that touches on an ultimate issue at trial is impermissible. Instead, the evidence rules provide that certain opinion evidence is permissible even when it embraces an ultimate issue of fact. ER 701, 704. Moreover, evidence that is voluminous, and which cannot conveniently be examined in court may be presented in the form of charts, summaries, or calculations. ER 1006. Thus, "testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." *Heatley*, 70 Wn. App. at 578.

### A. Data Analyst Testimony

Pettis contends that Voigtlaender commented on his guilt in two ways: first when he presented a slide subtitled "Pathway to Premeditation," and again when he referred to Pettis as an "insider threat" and pointed to certain messages as "interesting" and "noteworthy." Br. of Appellant at 53-54.

Turning first to Voigtlaender's slide, the State concedes that the slide with the subtitle "Pathway to Premeditation," was an improper opinion on the defendant's guilt. Br. of Resp't at 92. We agree that this was improper opinion evidence and the error was manifest. Applying the *King* factors, we note that Voigtlaender testified as a law enforcement officer, which can be particularly prejudicial because "police officers' testimony carries an 'aura of reliability.'" *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008) (quoting *State v. Demery*, 144 Wn.2d 753, 765, 30 P.3d 1278 (2001)). In addition, the slide used the word "premeditation," which parroted the legal standard for guilt used in the to-convict jury instruction. *See City of Seattle v. Levesque*, 12 Wn. App. 2d 687, 710, 460 P.3d 205 (2020) (officer's opinion on ultimate fact that parroted the legal standard of guilt used in jury instructions was an improper opinion of guilt). There is no question that Voigtlaender would not be allowed to provide an explicit opinion that Pettis acted with premeditation. *See State v. Montgomery*, 163 Wn.2d 577, 587-88, 183 P.3d 267 (2008) (officer's testimony that the officer "felt very strongly" that the defendant was buying ingredients to manufacture methamphetamine was an improper opinion on the defendant's intent). And yet the sub-heading in Voigtlaender's slide was almost as explicit. Because this comment was a nearly explicit comment on Pettis's guilt, Pettis has demonstrated that this comment was a manifest error affecting a constitutional right.

Next, we consider Pettis's challenges to other comments made by Voigtlaender. Pettis contends that Voigtlaender's testimony was peppered with comments that implicitly conveyed Voigtlaender's opinion of Pettis's guilt. Specifically, Pettis contends that Voigtlaender not only summarized the messages, but provided opinion testimony about which ones were "significant" or "noteworthy." He contends that Voigtlaender testified to using a "counter-intelligence move" to determine that Pettis had become "an insider threat and decide[d] to do harm to people that [he had] . . . sworn to uphold or love." RP at 833, 832; Appellant's Br. at 53 (alteration in original).

We disagree with Pettis's characterization of Voigtlaender's testimony and his argument that Voigtlaender's opinion testimony was manifest error. The purpose of Voigtlaender's testimony was to summarize 100,000 lines of data, help the jury recognize patterns within the data, and demonstrate how certain words and phrases within the messages could show identity and planning. Voigtlaender did not testify that Pettis was an insider threat. Instead, Voigtlaender referred to his own experience and training in counter intelligence, referenced a hypothetical person, and then applied this training to the data in this case to explain why the jury should focus on certain messages among the thousands.

Pettis nevertheless contends Voigtlaender used words and phrases that implied he was guilty. In support of this position, Pettis relies on *Barr*. 123 Wn. App. 373. In *Barr* a police witness testified that he had received special training to detect body language and

37

verbal cues that demonstrated deception. *Id*. at 378. When used on the defendant, the officer testified that he observed signs of deception. *Id*. On appeal, this court rejected the State's argument that the officer did not testify that the defendant was being deceptive but was only testifying as to his observations. *Id.* at 382. Instead, we found that the "testimony embodied an opinion by the officer that [the defendant] had committed the offense and the officer had the training to determine that [the defendant's] statements and body language were proof that this was true." *Id.* We distinguished *Heatley* by noting that the officer's opinion was based on his experience and observations and was helpful to the trier of fact whereas in *Barr* there were no recognized techniques for determining deception from body language. *Heatley*, 70 Wn. App. 573; *Barr*, 123 Wn. App. at 383.

*Barr* is both factually and legally distinguishable. Here, Voigtlaender summarized large amounts of data and, based on his experience and training, provided opinions on patterns, unique words, and phrases to help the jury decipher and interpret the evidence. The decision in *Barr* preceded the Supreme Court decisions in *Kirkman* and *King* which held that improper opinion testimony is not manifest unless it is an explicit or nearly explicit opinion of guilt. *Kirkman*, 159 Wn.2d at 936; *King*, 167 Wn.2d at 332. Here, Pettis acknowledges that Voigtlaender did not use the word "guilty," but contends that Voigtlaender implied his opinion of Pettis's guilt by pointing out that certain messages were "significant," and "noteworthy." Appellant's Br. at 54. While we disagree that Voigtlaender implied guilt, Pettis fails to demonstrate that Voigtlaender's testimony

provided explicit or nearly explicit opinions of guilt that are necessary to show manifest error.

### B. *Family Members and Medical Examiner*

Pettis also argues that the State introduced evidence of an improper opinion of guilt from Culp and David William, which were compounded by testimony from the medical examiner and detective. We address these challenges in turn.

During redirect, the State asked David William whether, based on information he received from law enforcement, he had developed a belief. Over an objection based on speculation, David William responded that he "came to believe that my dad had something to do with my mother's death." RP at 338. Arguably, this issue was preserved. Regardless, we find that it constitutes a near explicit opinion on Pettis's guilt and was therefore manifest error.

While David William did not testify that he thought his father was guilty or that his father murdered his mother, the only issue at trial was whether Pettis ground up the hydrocodone and put it in Peggy's drink on the night she died with the intent to murder her. Given the focus of Pettis's defense, David William's testimony, that he believed his father had something to do with his mother's death, was a near explicit opinion on Pettis's guilt.

While we conclude that David William's opinion testimony was manifest error, we do not reach the same result with respect to Culp's testimony and the testimony of the

detective and medical examiner. Testifying that family members had "concerns," or even that Culp had concerns about Peggy's death is not the same as testifying to a conclusive belief of Pettis's guilt. Instead, the testimony was introduced to discredit Culp's inconsistent trial testimony and show why the witnesses took certain steps, such as contacting the medical examiner or law enforcement, or taking steps to investigate insurance policies and medical records. Neither Culp's testimony nor the testimony of the detective or medical examiner constituted an explicit or nearly explicit opinion of Pettis's guilt.

3.      HARMLESS ERROR

Pettis has demonstrated two instances of manifest constitutional error. The last step in our analysis is to determine whether the errors are harmless. *Barr*, 123 Wn. App. at 380. For a constitutional error to be harmless, the State must establish "beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error." *State v. Quaale*, 182 Wn.2d 191, 202, 340 P.3d 213 (2014). Put differently, we must be convinced "that the error did not contribute to the verdict." *State v. Heng*, 2 Wn.3d 384, 395, 539 P.3d 13 (2023).

Here, we find the two errors were harmless beyond a reasonable doubt. First, we note that the errors were relatively minor and fleeting compared to the overall evidence produced at trial. The trial lasted seven days. The State called 41 witnesses and defense called three witnesses. Voigtlaender's slide included the words "Pathway to

Premeditation," but neither Voigtlaender nor the prosecutor uttered these words during trial. Furthermore, the slideshow was demonstrative and did not go back with the jury during deliberations.

Likewise, David William's admission that he came to believe his father had something to do with his mother's death, while an improper opinion, was fleeting and not repeated. Neither improper comment was mentioned during closing argument or used by the State to support its position.

In addition, the State's evidence was overwhelming. The State introduced evidence that Pettis was having an affair and making plans to start a new life with Robin on the east coast. Meanwhile, Pettis was telling people that Peggy had dementia while insisting on obtaining two additional life insurance policies on Peggy, both of which went into effect days before she died.

In the weeks after Peggy's death, Pettis told different stories about how Peggy died to friends and family members. Four witnesses testified that Pettis admitted to them that he crushed up hydrocodone and put it in Peggy's drink the night she died. A fifth witness testified that she saw Pettis prepare Peggy's drink that night and thought it was unusual.

Despite Pettis's claim that Peggy was in so much chronic pain that she was taking three hydrocodone's a day, she passed a physical three weeks before she died. And despite Pettis's claim that Peggy took three bottles of hydrocodone from her former

mother-in-law four years before her death, Pettis did not show first responders any of

these bottles on the night of her death or mention these pills during his first interview

with law enforcement.  Instead, the only medications Pettis showed first responders was a

lock box with his prescription for hydrocodone and some loose pills including trazodone

which had also been prescribed to Pettis and was found in Peggy's system.

In light of the evidence in this case and the nature of the errors, we are satisfied

beyond a reasonable doubt that the errors did not contribute to the jury's verdict.

4.      INEFFECTIVE ASSISTANCE OF COUNSEL

Pettis contends that in the event we determine that the challenged testimony is not

reviewable as a manifest constitutional error, then counsel was ineffective for failing to

object.  Of the four areas of testimony that Pettis claimed were improper, we reviewed two

as manifest constitutional error.  Here, we consider whether counsel was constitutionally

ineffective for failing to object to the other two areas of testimony: portions of

Voigtlaender's testimony and the testimony that family members had suspicions.

Both the Sixth Amendment to the United States Constitution and art. I, § 22 of the

Washington State Constitution guarantee effective assistance of counsel.  *State v. Grier*,

171 Wn.2d 17, 32, 246 P.3d 1260 (2011).  Claims of ineffective assistance of counsel are

reviewed de novo.  *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014).  A

successful claim requires the defendant to demonstrate two components: that counsel's

performance was deficient, and that deficient performance caused prejudice.  *Strickland*

*v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Representation is deficient if after considering all circumstances, it falls "'below an

objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 466

U.S. at 688). Further, "[p]rejudice exists if there is a reasonable probability that except

for counsel's errors, the result of the [trial] would have been different." *Hamilton*, 179

Wn. App. at 879. To prevail on an ineffective assistance claim, a defendant must

overcome a "strong presumption that counsel's performance was reasonable." *State v.

Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

The defendant has the burden to "show in the record the absence of a legitimate

strategic or tactical reasons supporting the challenged conduct by counsel." *State v.

Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "A classic example of trial tactics is

when and how an attorney makes the decision to object during trial testimony." *Id*. If a

defendant's ineffective assistance of counsel claim is based on the "failure to object, then

'the defendant must show that the objection would likely have succeeded.'" *Id.* (quoting

*State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)). Nevertheless, "a few or

even several failures to object are not usually cause for finding that an attorney's conduct

has fallen below the objective standard of conduct." *Id.* at 250. "Only in 'egregious

circumstances, on testimony central to the State's case, will the failure to object

constitute incompetence of counsel justifying reversal.'" *Id.* at 248 (quoting *Crow*, 8

Wn. App. 2d at 508).

Pettis fails to demonstrate that defense counsel's performance fell below an objective standard of reasonableness and was deficient. First, Pettis fails to demonstrate that an objection to Voigtlaender's testimony would have been sustained. Voigtlaender testified that "[w]hen someone is an insider threat and decides to do harm to people that they have sworn to uphold or love, and that person then does something violent, we look at patterns of what changes." RP at 832. He then pointed out changing patterns in the communications contained in the State's exhibit.

Under the evidence rules, expert witnesses are allowed to express opinions on their area of expertise when it will help the trier of fact. ER 702; ER 701; *State v. Montgomery*, 163 Wn.2d 577, 590, 183 P.3d 267 (2008). The evidence rules do not allow any witness to testify to personal opinions of the defendant's guilt, "the intent of the accused, or the veracity of witnesses." *Id.* at 591. But, "[t]he mere fact that an expert opinion covers an issue that the jury has to pass upon does not call for automatic exclusion." *Id.* at 590.

Here, Voigtlaender testified that he looked through thousands of lines of data for communications by Pettis that demonstrated changing patterns. This helped the jury decide which areas of the voluminous exhibit to focus on and why. Moreover, while Voigtlaender's opinion testimony provided evidence of Pettis's guilt, his testimony did not express a personal belief of Pettis's guilt.

44

Similarly, Pettis fails to demonstrate that objections to testimony that family members had suspicions or curiosities would have been sustained. Culp testified that she contacted the medical examiner because other family members had suspicions and she had curiosities about her mother's death. The medical examiner testified that Culp contacted him with suspicions and he advised her that if she was concerned she should contact law enforcement. A detective testified that he decided to pursue further investigation based on suspicions of family members. Unlike David William's testimony, that he came to believe his father had something to do with his mother's death, these "suspicions" were generalized, nonspecific, and introduced to show why Culp called the medical examiner and why the detective pursued an investigation.

In addition, there may have been strategic reasons for not objecting to this testimony. Culp testified that while her mother's family had given her "cause to have curiosities," her father had done nothing to raise suspicion. RP at 981-92. Defense counsel may have wanted the jury to hear this evidence.

Even if the trial court would have sustained objections to these areas of testimony, Pettis fails to demonstrate prejudice. Pettis would need to demonstrate a reasonable probability that if trial counsel had not erred, the result of the trial would have been different. *Grier*, 171 Wn.2d at 34. We are confident that the outcome of the trial would have been the same even if Voigtlaender had not used the term "insider threat," and if the witnesses had not testified that some family members had concerns about Peggy's death.

45

Pettis does not meet his burden of showing counsel was constitutionally ineffective.

5.      LEGAL FINANCIAL OBLIGATIONS

Pettis contends that recent amendments to legal financial obligations (LFOs) apply to his case and require that certain LFOs be struck from his judgment and sentence. The State concedes that we should strike his VPA and DNA collection fee. Under former RCW 7.68.035(1)(a) (2018), a judge was required to impose the $500 penalty assessment for one or more felony or gross misdemeanor convictions. However, last year, legislation amended this statute. *See* LAWS OF 2023, ch. 449, § 1. This amendment had an effective date of July 1, 2023, and included a provision instructing a sentencing court to not impose the penalty assessment if the court found a defendant indigent at the time of sentencing. *See* LAWS OF 2023, ch. 449, § 1. Additionally, former RCW 43.43.754 (2021) provided that the DNA collection fee was mandatory. However, also effective July 1, 2023, the legislature eliminated this provision. LAWS OF 2023, ch. 449, § 4(2). Although both amendments took place after Pettis's sentencing, it applies to cases pending appeal. *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

No. 38726-7-III
*State v. Pettis*

Because the sentencing court found Pettis indigent and his case is pending appeal, we remand for the superior court to strike the VPA and DNA fee. Otherwise, we affirm Pettis's conviction and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

I CONCUR:

_____
Lawrence-Berrey, C.J.

No. 38726-7-III

FEARING, J. (dissenting) — I agree with the ruling of the majority that the State violated David Pettis' constitutional right to a fair trial with testimony from witnesses opining as to or suggesting guilt. I conclude, however, that the breadth of such inadmissible testimony extends beyond that recognized by the majority. I also would hold, contrary to the majority, that Pettis' trial counsel performed ineffectively when failing to bring a motion in limine or object at trial to the inadmissible evidence. More importantly, I disagree with the majority that the inadmissible evidence, ineffective assistance of counsel, and unfair trial constituted harmless error. The State carries a high burden to prove beyond a reasonable doubt that a constitutional error was harmless and the State fails to do so. Pettis suffered prejudice from the deep and broad breach of his constitutional rights to a fair trial and competent counsel and should be granted a new trial for the charge of first degree murder of his wife. Thus, I dissent while concurring in part.

This dissenting opinion will list and review the mountain of evidence, particularly opinion testimony of guilt, that the State should have never presented to the jury. When doing so, I divide the evidence into groupings based on the witness uttering the judgment of guilt: Mark Voigtlaender, David William Pettis, and Elizabeth Culp. I analyze why the evidence breached David Pettis' right to a fair trial. I also address David Pettis' assignment of error based on ineffective assistance of counsel. I end by evaluating

whether the State shows harmless error beyond a reasonable doubt. I employ the same names for witnesses used by the majority.

Mark Voigtlaender

Mark Voigtlaender served as the Spokane County Sheriff's Office's investigative analyst for the death of Peggy Pettis. Voigtlaender had 2,500 hours of specialized training in investigative analysis. According to the State, Voigtlaender possessed qualifications in cell phone forensics.

Mark Voigtlaender's tasks for this prosecution included reviewing phone call records and the content of e-mail, Facebook messages, and cell phone text messages. Most of the communications moved between David Pettis, Peggy Pettis, and Robin between November 2017 and August 2018, with the death of Peggy being on June 25, 2018. Voigtlaender analyzed this data in a process labeled an "aggregation." 2 Report of Proceedings (RP) (Dec. 6, 2021) at 714-15.

Mark Voigtlaender spread the data from the e-mail and messages collected onto an Excel spreadsheet. The data consisted of 2,950 PDF pages and 99,000 lines of text. Based on the data, he prepared a PowerPoint presentation to assist the jury.

David Pettis challenges as inadmissible and violative of his right to a fair trial a slide entitled "'Pathway to Premeditation'" shown by Mark Voigtlaender to the jury during a PowerPoint presentation. Br. of Appellant at 2-3. Pettis also challenges the following statements of Voigtlaender elicited during the PowerPoint presentation, which

2

statements described, labeled, characterized, probed, and impugned the communications

among, Peggy Pettis, Robin, and David Pettis:

1.  Certain e-mail are "noteworthy," 2 RP (Dec. 7, 2021) at 833, 835;

2.  Some e-mails constitute "significant item[s] of potential consideration,"

2 RP (Dec. 7, 2021) at 835;

3.  E-mail messages are interesting when read together;

4.  An e-mail chain shows David Pettis's progression of thoughts;

5.  Pettis had a particular mindset, mental state, or intent;

6.  Some of Pettis's e-mail messages exhibited his being "distraught," 2 RP (Dec.

7, 2021) at 831, 835, 840-41, 854-55;

7.  Pettis was under emotional distress;

8.  Pettis engaged in transference of affection;

9.  Peggy Pettis communicated with small words and single sentences;

10.  Pettis, not Peggy, used the word "fishing," 2 RP (Dec. 6, 2021) at 736-37;

2 RP (Dec. 7, 2021) 825-26, 862-63;

11.  Pettis typed the grammatical incorrect "your" rather than "you're," 2 RP

(Dec. 6, 2021) at 737-38;

12.  A comment from a wife about sharing her husband was unusual;

13.  Pettis admitted to others that he used Peggy's account to communicate;

14.  Pettis used his wife's e-mail account to make it appear that Peggy

communicated with Robin;

3

15. Counterintelligence themes explained the death of Peggy Pettis;

16. His [Voigtlaender's] forensic review of communications found analytical proof;

17. David Pettis was an insider threat;

18. David Pettis performed a violent act; and

19. Pettis decided to harm a person he had sworn to uphold or love.

Mark Voigtlaender's remarkable testimony in his role as linguist, copy editor, romance guide, psychologist, psychic, priest, counterintelligence officer, prosecutor, and factfinder extended for 78 transcript pages. His testimony followed a trend of trying criminal cases on extrapolations by law enforcement officers rather than exclusively on the facts.

David Pettis' challenges to the testimony of Mark Voigtlaender arise from these trial transcript passages:

> Q Now, you—last thing on slide you mention transitions in three separate messages. Talk about why these—*what are these transitions and why are they of note*?
> A So one thing that's—*that's interesting* that I've used in other investigative arenas, whether it be—particularly, *let's look at counter-intelligence move: When someone is an insider threat* and *decides to do harm to people* that they have sworn to uphold or love, and *that person then does something violent*, we look at patterns of what changes, if there's something in the way they communicate that communicates *where their mindset is*, particularly if it's around a time stamp or time frame where there's a lot of emotional upheaval, are there phrases, are there indications of what that individual is looking at or what they're doing.
> To me these three conversations, that—the phraseology, the timing, the internet protocol addresses, and the type of conversation that was being committed at those times—or that was being made on Peggy's account

4

seem to fit a time where there was—particularly with these phrases, the first message a wife was saying to a potential lover that I'm willing to share my husband with you. The second message was that when I'm gone, which is a transition from sharing to saying he's all yours. And then to the third one, if something happens. *So that progression from those three messages, that looked to be from Dave, became a significant item of potential consideration in this trial.*

Q *Is it unusual for individuals to use those kind of phraseology, those kinds of transitions*?

A I don't know if it's unusual or not. *It was noteworthy* in this because of what else was happening, so I can't speak to . . .

Q Okay. When you speak about what else was happening, are you talking about what else was happening around the time of these messages?

A Correct. Yes. The rest of the—the other messages that—that— *the mental and emotional state that I saw Dave was in* as I looked at the other messages, *these became significant*, and other activities that he had done, so, for instance—

[DEFENSE COUNSEL]: Objection, Your Honor. Narrative.

THE COURT: Sustained.

BY [STATE'S ATTORNEY]:

Q Mr. Voigtlaender, what—*you said that these became noteworthy* based off of other messages that you had read, and that was other messages in the same time frame?

A Correct.

Q Okay. Are they messages that we have talked about yesterday during your testimony?

A No.

Q Okay. So *are there particular messages that are of note* to you that are kind of—helped you form this understanding and analysis?

A Yes. There's other messages and *other communications that we haven't talked about that make this interesting* at this point.

2 RP (Dec. 7, 2021) at 832-34 (emphasis added).

Q Okay. So the fact that there's this request for life insurance on behalf of Mrs. Pettis around the same time that she talks—ostensibly her account talks to [Robin] about if something happens to Mrs. Pettis, *that was noteworthy to you*?

A Correct.

2 RP (Dec. 7, 2021) at 835 (emphasis added).

5

Q   Now, I believe where we left off this morning, we'd spent some time on the slide going through the *messages that you found of note* from March of 2018.  I believe there were a few others we hadn't really talked about yet that I wanted to have you explain why they're included.  It looks like there's a couple from March 2nd of 2018.  Please explain for the jury *why you included those in that it was something interesting*.
A   Correct. . . .

2 RP (Dec. 7, 2021) at 847 (emphasis added).

Q   . . . I believe, on March 14th there's a message that you put a portion of up there regarding an MRI.  Can you please expand upon that, *explain why that was interesting*?
A   Correct.  On the 14th of March, Dave has a conversation with Robin and he talks about a dream that he had when he was in the MRI.  And part of that was, "We swam naked for a couple of hours.  Damn MRI ended."  And that was the *conversation that seem significant to point to what Dave's state of mind was at the time*.

2 RP (Dec. 7, 2021) at 847-48 (emphasis added).

Q   And then you also bolded a few phrases towards the bottom of that message.  *Why were those phrases of interest*?
A   So when looking at this, as far as *one of the considerations or one of the points of interest* that I was looking at to see if there was *some analytical proof to is: Was there a transference of emotional—of emotion or affection from one individual to another?*  Was it dual?
And in this instance, *this indicated that there was affection that was being towards Robin, as opposed to Peggy*.  And the point of how, "*The thought of losing you is killing me*," *is a significant declaration* of affection or love to that individual.  In this instance, Robin . . . .
Q   So that's why all three of these phrases were bolded?
A   Correct.
Q   Okay.  And then the next message you have up there is from March 13th.  *Why is that message of interest*?
A   So the—*this shows a trend of many things* that happened during the month of March, right, that—that there is a—that there appears to be a time where—whether it's a day, whether it's a couple days, there is no communication between Dave and Robin.  And despite—there's no communication.  And this was in response to what appeared to be a day or

6

two of no communication, that *the silent treatment really hurts a lot, expressing that if he doesn't have that interaction with her, it hurts him emotionally is how I took that data.*

Q   And to you, based on your training and experience, is that transference of emotional attachment that you mentioned?

A   Correct.  That *transfer of affection* is another indication that is deepening.

Q   And then a last message on that slide from March 17th of 2018. Please explain: *Why is that of interest*?

A   So Dave had multiple different conversations with individuals and there were some individuals, as we talked about earlier when Elizabeth and Peggy were talking about the state that Dave was in, that he had gone crazy, was the quote.  This was an indication—another indication by Dave himself stating *what state of mind that he's in,* in this instance, "I'm fucking wreck."

. . . .

Q   So this message on the 17th of March, from your review of the data, that flows from and is connected to those other two messages on the screen there?

A   Correct.  It shows that there's—there is *emotional distress that is happening as this transference of emotion is happening*, as affection is happening.

2 RP (Dec. 7, 2021) at 850-52 (emphasis added).

Q   Okay.  And then can you briefly explain *why that message is of interest*?

A   So that, again, goes to Dave, *how he sees himself mentally, and that—again, that transference of affection. . . .*

2 RP (Dec. 7, 2021) at 853 (emphasis added).

Q   Okay.  And then next up there you have a message from March 22nd between Ms. Culp and Mrs. Pettis.  Is that also indicative of what you're talking about earlier, *as far as Mr. Pettis's state of mind*?

A   Correct.  It is.

2 RP (Dec. 7, 2021) at 854 (emphasis added).

7

The State insists that Mark Voigtlaender never labeled David Pettis as an inside threat but a reasonable juror would conclude otherwise. To repeat, Voigtlaender remarked:

> A   So one thing that's—*that's interesting* that I've used in other investigative arenas, whether it be—particularly, *let's look at counter-intelligence move: When someone is an insider threat* and *decides to do harm to people* that they have sworn to uphold or love, and *that person then does something violent*, we look at patterns of what changes, if there's something in the way they communicate that communicates *where their mindset is*, particularly if it's around a time stamp or time frame where there's a lot of emotional upheaval, are there phrases, are there indications of what that individual is looking at or what they're doing.

2 RP (Dec. 7, 2021) at 832 (emphasis added). Voigtlaender commenting about an insider threat served no purpose except to opine that his review of communications showed Pettis as a threat to Peggy. He referred to "someone" as an insider threat based on e-mail he reviewed and David Pettis was a sender and recipient of the messages.

At trial, the State characterized Mark Voigtlaender as a witness called to summarize and interpret the communications among David Pettis, Peggy Pettis, and Robin. The State asserted such testimony to be authorized by ER 1006. ER 1006 allows a party to present the contents of voluminous records "in the form of a chart, summary, or calculation." Contrary to the position of the State, the evidence rule does not permit a witness to interpret the capacious records. Neither the majority nor the State cites any authority permitting an expert witness to interpret writings.

Expert testimony can be used to explain the meaning of technical terms and words of art. *Kries v. WA-SPOK Primary Care, LLC*, 190 Wn. App. 98, 120, 362 P.3d 974

8

(2015). Nevertheless, expert opinion on contract interpretation is usually inadmissible. *Kries v. WA-SPOK Primary Care, LLC*, 190 Wn. App. 98, 120 (2015). This principle should apply to interpretation of e-mail communications.

David Pettis, Peggy Pettis, and Robin never used technical language in their very human communications. The jury could have and should have performed its own interpretation of the correspondence without the help from an expert.

A prosecutor's summary witness may help the jury organize and evaluate factually complex evidence. *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). Still the government's calling of a witness to summarize voluminous evidence wrongly suggests that the State calls the witness for some neutral, educational trial purpose. *United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020). Prosecutors call witnesses, including summary witnesses, to prove their case – to help convince the jury that the defendant is guilty as charged. *United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020).

A court must place limits on the sort of "help" a government summary witness may provide. *United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020). The witness may not usurp the jury's fact-finding function by summarizing or describing what is in the evidence and what inferences should be drawn from that evidence. *United States v. Hampton*, 718 F.3d 978, 982-83 (D.C. Cir. 2013). The court must guard against the jury treating summary testimony as additional evidence or as corroborative of the truth. *United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020).

9

The State could have submitted important e-mail it deemed noteworthy without any commentary from a law enforcement officer or other witness. If the State deemed the evidence problematic because of its size, it could have limited the exhibit or exhibits to the important messages. In the alternative, the State could have introduced all of the communications as an exhibit and then identified to the jury in closing the e-mail on which to focus.

During opening and closing arguments, the prosecutor could have shown jurors the e-mail wherein David Pettis used the word "fishing," and informed the jury that only those messages from Peggy's account, which the State maintained were composed by Pettis, inserted the word "fishing." During counsel's argument, the State could have mentioned Pettis' penchant to use the grammatical incorrect "your" rather than "you're." The State during opening and closing could have informed the jury that its position was that it believed David Pettis used Peggy's accounts without an ersatz expert claiming such.

The PowerPoint slide show and the accompanying testimony of Mark Voigtlaender characterized David Pettis as guilty of murder. "No witness, lay or expert, may testify to [their] opinion as to the guilt of a defendant, whether by direct statement or inference." *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987) (citing *State v. Garrison*, 71 Wn.2d 312, 315, 427 P.2d 1012 (1967)). Such an improper opinion undermines a jury's independent determination of the facts and invades the defendant's constitutional right to a trial by jury. *State v. Kirkman*, 159 Wn.2d 918, 927-28, 155 P.3d

125 (2007); *State v. Olmedo*, 112 Wn. App. 525, 530-31, 49 P.3d 960 (2002). Particularly when an opinion is expressed by a government official, such as a law enforcement officer, the opinion may influence the factfinder and thereby deny the defendant of a fair and impartial trial. *State v. Carlin*, 40 Wn. App. 698, 703, 700 P.2d 323 (1985); *State v. Haga*, 8 Wn. App. 481, 492, 507 P.2d 159 (1973), *overruled on other grounds by City of Seattle v. Heatley*, 70 Wn. App. 573, 854 P.2d 658 (1993).

The majority faults the defense for failing to object to Mark Voigtlaender improperly opining on David Pettis' guilt because trial counsel only objected on the basis of speculation and narrative. Because of the manifest constitutional error, I need not resolve this question. But the objection of "speculation" parallels the objection of improper opinion testimony. When uttering insupportable opinions, the witness in part speculates. Voigtlaender was speculating for the jury as to David Pettis' guilt.

When discerning that only limited portions of Mark Voigtlaender's testimony constituted an opinion on guilt, the majority discretely and mistakenly analyzes each challenged piece of testimony or evidence. This evaluation of the evidence ignores the combined effect of the ongoing and extensive testimony of Mark Voigtlaender, beginning with his slide that reads: "Pathway to Premeditation." Although the majority recognizes the slide constituted an opinion on David Pettis' guilt, the majority fails to note that the State fashioned the remaining testimony of Voigtlaender to support his conclusion of premeditated murder.

11

When viewing the evidence as a whole, the process by which a jury views the evidence, one inevitably discovers that Mark Voigtlaender told the jury that some e-mail were noteworthy, interesting, or significant items for consideration, that an e-mail chain shows David Pettis's progression of thoughts, that Pettis had a particular mindset, mental state, or intent, that Pettis was distraught and under emotional distress, that Pettis engaged in transference of affection, that Peggy Pettis communicated with small words and single sentences, that Pettis, not Peggy, use the word "fishing," that Pettis typed the grammatical incorrect "your" rather than "you're," that Voigtlaender engaged in a counterintelligence role that resulted in his discerning analytic proof, that David Pettis operated as an inside threat, and that Pettis performed a violent act, and that Pettis decided to harm a person he had sworn to uphold and love. These impermissible opinions all fit like a glove to the State's and Voigtlaender's theme of David Pettis' passageway to premeditated homicide. Voigtlaender told the jury that certain communications were noteworthy because the messages pointed to Pettis' guilt. Voigtlaender talked about analytical proof because that proof was an attestation of Pettis' guilt. Voigtlaender averred to a desire to harm a loved one, because that testimony showed Pettis' guilt. I could go on and on.

In addition to violating David Pettis' right to a fair trial, Mark Voigtlaender's testimony was inadmissible because the State never qualified Voigtlaender as an expert witness, Voigtlaender did not testify to opinions based on accepted practices in his many fields of simulated expertise, and his testimony did not assist the jury in its role as fact

12

finder. ER 702 governs the admission of expert testimony. *State v. Groth*, 163 Wn. App.

548, 561, 261 P.3d 183 (2011). The rule declares:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under ER 702, admissibility depends on whether (1) the witness qualifies as an expert,

(2) the opinion is based upon an explanatory theory generally accepted in the scientific

community, and (3) the expert testimony would be helpful to the trier of fact. *State v.*

*Willis*, 151 Wn.2d 255, 262, 87 P.3d 1164 (2004); *State v. Groth*, 163 Wn. App. 548,

561-62 (2011).

An expert may not testify about information outside their area of expertise. *In re*

*Marriage of Katare*, 175 Wn.2d 23, 38-39, 283 P.3d 546 (2012); *Queen City Farms, Inc.*

*v. Central National Insurance Co. of Omaha*, 126 Wn.2d 50, 103-04, 882 P.2d 703

(1994). Mark Voigtlaender testified he had 2,500 hours of specialized training in

investigative analysis, but he did not identify the specifics of the training and how the

training qualified him to review communications. Voigtlaender also boasted about

qualifications in cell phone forensics. He never disclosed what it takes to be qualified in

cell phone forensics, what specific training he underwent, the nature of cell phone

forensics, or the special knowledge he gained by that training.

More importantly, the State never qualified Mark Voigtlaender as an expert

witness in any of the variety of subject areas to which he testified: use of the English

13

language, counterintelligence moves, psychology, computer usage, and romance. The State never identified what, if any, experience, Voigtlaender had in order to interpret voluminous e-mail messages. Voigtlaender never isolated any specialized training in interpreting or discerning the importance of e-mail communications.

Expert testimony is admissible if the witness' opinion is based on material reasonably relied on in their professional community. *Reese v. Stroh*, 128 Wn.2d 300, 306, 907 P.2d 282 (1995); *Deep Water Brewing, LLC v. Fairway Resources. Ltd.*, 152 Wn. App. 229, 271, 215 P.3d 990 (2009). Mark Voigtlaender never suggested that he based his opinions on practices or sources accepted in his professional community.

Evidence is admissible under ER 702 if the expert testimony would help the jury. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013); *State v. We*, 138 Wn. App. 716, 724-25, 158 P.3d 1238 (2007). "Generally, expert evidence is helpful and appropriate when the testimony concerns matters beyond the common knowledge of the average layperson, and does not mislead the jury to the prejudice of the opposing party." *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999). Thus, opinion testimony explaining complex or arcane medical, psychological or technical evidence may help the jury. *State v. Avendano–Lopez*, 79 Wn. App. 706, 710-11, 904 P.2d 324 (1995).

An expert's testimony cannot cover knowledge possessed by a layperson. The State never explained why the jury needed assistance in interpreting the correspondence of Robin, David Pettis, or Peggy Pettis. In *American Family Mutual Insurance Co. v.*

14

*Kline*, 780 F. Supp. 2d 839 (S.D. Iowa 2011), the court held inadmissible an expert's

opinion regarding the identity of the person whose voice was heard on a recording and

the mental states of individuals hearing on the recording. The expert did not use any

specialized knowledge or methodology to interpret 911 recording. He based his expert

opinion on his own sensory observations of recording, and jury would be capable of

listening to recording and interpreting it for themselves.

Mark Voigtlaender's testimony repeatedly violated principles emanating from ER

702. For example, Mark Voigtlaender declared that a comment purportedly from a wife

about sharing her husband was noteworthy. The jury needed no expert to say this. The

jury did not need any witness to inform it that one person can use another's Facebook

account or e-mail address for messaging, particularly when the usurper lives in the same

home as the account holder and shares computers with the other.

Mark Voigtlaender repeatedly testified to the state of mind of David Pettis. He

claimed that e-mail messages confirmed that Pettis was distraught and emotionally

stressed. Voigtlaender spoke of Pettis transferring his love, protection, and loyalty to

another woman. But a lay jury, relying on common experience and without the aid of an

expert, is capable of deciding a defendant's state of mind. *State v. Farr-Lenzini*, 93 Wn.

App. 453, 464 (1999).

In *State v. Farr-Lenzini*, 93 Wn. App. 453 (1999), this court reversed the

conviction of Lisa Ann Farr-Lenzini for attempting to elude a police officer. A state

trooper testified at trial that Farr-Lenzini intentionally eluded him rather than having

failed to heed the trooper's instructions because of a distraction. The State argued that the trial court properly admitted the trooper's opinion under ER 704. ER 704 allows for the admission of an opinion or inference on an ultimate issue that the trier of fact must decide provided that the opinion or inference is otherwise admissible. The trooper testified to years of experience as a vehicle instructor trained in accident investigation and had participated in fifty to eighty arrests for attempting to elude. The court still ruled that the officer could not testify to Farr-Lenzini's state of mind.

The majority writes that this dissent raises evidentiary issues not raised by David Pettis at trial or on appeal. I agree the evidentiary issues were not raised before the superior court. As a general rule, the accused must object to inadmissible evidence at trial or waive the right to challenge the evidence on appeal. *State v. Torres*, 198 Wn. App. 864, 876, 397 P.3d 900 (2017). But, as recognized by the majority, the accused may assert, for the first time on appeal, evidentiary error comprising manifest constitutional error. All of the evidentiary issues surround and attach to the manifest constitutional error of Mark Voigtlaender's description of a journey to premeditated murder. As examined later, the failure to object to the evidence on such grounds constituted ineffective assistance of counsel, which also may be raised for the first time on appeal.

I disagree with the majority that this dissent raises evidentiary issues not asserted by David Pettis on appeal. The dissent follows the assertions by Pettis on appeal as to the inadmissible evidence and the nature of the evidence.

16

David William Pettis

At trial, David William Pettis, the son of Peggy and David Pettis, testified in response to the State's questioning:

> Q  And regarding that conversation [with law enforcement], did you express to law enforcement your concerns about the death of your mother?
> A  Yes, I did.
> Q  What were those concerns?
> A  That there was something else.  I wanted to know the truth of what happened to Mom.
> Q  And did you come to develop a belief, based upon the information you received from law enforcement?
> A  Yes.
> Q  And what's that?
> [DEFENSE COUNSEL]: Objection, Your Honor.  Speculation.
> [STATE'S ATTORNEY]: It's his belief based on information he's been provided.
> THE COURT: I'll allow it under the circumstances.
> A  *I came to believe that my dad had something to do with my—I came to believe that my dad had something to do with my mother's death.*

1 RP (Dec. 1, 2021) at 337-38 (emphasis added).

The majority concludes that this testimony of David William constituted an opinion of guilt that violated David Pettis' right to a fair trial.  I agree.  No witness may testify to the guilt of a defendant regardless of the volume of the information on which he rests the opinion.

Elizabeth Culp

Elizabeth Culp, daughter of David and Peggy Pettis, testified at trial:

> Q  So in—in August 2018 when you're being interviewed by law enforcement and—at that point did you know that there were suspicions about the death?
> A  I knew that my mother's family had suspicions.

17

Q  Just your mother's family?

A  My mother's family, yes.

Q  You actually—you—you made a call in the days after she died with suspicions, correct?

A  My family had given me cause to have curiosities.

Q  Just your family?

A  My mother's family, yes.

Q  Okay.  What about your dad?

A  No.

Q  So nothing that your dad said—

A  My dad was—

Q  —to you—

A  My dad was grieving.  Everybody reacts to grief differently.

Q  Do you recall contacting the medical examiner's office?

A  Yes, I do.

Q  Okay.  Do you recall having a conversation with one of the persons who returned your call?

A  To my recollection, my question to them was, "If a family had concerns, then what would we do about it?"

Q  Do—do you recall saying that you had concerns about the death?

    A. I do not recall saying that myself.  No.

Q  Do you recall saying that your dad had been making statements since the death such as that he had to crush the hydrocodone and put it in her ice cream for her to swallow them?

A  I may have said that.  Yes.  I know my dad did that night.

Q  So that night, the night that she died, he crushed up her hydrocodone and put them in her drink for her?

A  That's what I was told, yes.

Q  By your dad?

A  When I had the conversation with him, yes.

2 RP (Dec. 8, 2021) at 981-82.

Detective Lyle Johnston and medical examiner's office employee James Uttke

echoed testimony from Elizabeth Culp.  Johnston averred:

Q  So at this point in time, we're—were you acting on concerns that you had based off the information you gathered or. . . .

A  Yes.  There was—at this particular point in time, I would say that there wasn't probable cause to believe that this was definitely an event of

18

foul play, but it certainly was suspicious. The family members had raised some issues that made it appear suspicious and so it definitely deserved further investigation.

2 RP (Dec. 2, 2021) at 588. After speaking to Melissa Mabe, Peggy's sister, Johnston sought to interview Pettis. He also reviewed insurance policies insuring Peggy's life.

James Uttke avowed:

> Q  Okay. I want to turn your attention to June 28, 2018.
> A  Okay.
> Q  Did you make a phone call to an Elizabeth Culp?
> A  According to the notes, yes.
> Q  Approximately what time did that happen?
> A  I entered the note at 2231, so I—it would have probably been the same day.
> Q  Okay. And in the course of that call—or, I guess, did Ms. Culp have concerns? Without talking about what she said.
> A  Can I read the full note before answering?
> Q  You can read it to yourself to refresh your memory.
> A  Yes. Yes, she did have concerns.
> Q  And did you give her any advice upon hearing her concerns?
> A  *The only advice I would have given her is to file a police report* with her concerns, but I did document her concerns.

2 RP (Dec. 7, 2021) at 931-32.

The majority rests its ruling rejecting David Pettis' challenge to testimony of Elizabeth Culp's suspicions on the rule that the opinion of guilt must be "'explicit or almost explicit'" to be inadmissible. *State v. King*, 167 Wn.2d 324, 332, 219 P.3d 642 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 936, 155 P.3d 125 (2007)). A reasonable juror will deem a family member's suspicion that one member killed another member of the family to be close to an opinion of guilt. Also, we should juxtapose with the majority's sympathetic principle with the rule that an opinion of guilt expressed

19

through inference is equally improper and equally inadmissible because it invades the province of the jury. *State v. Haga*, 8 Wn. App. 481, 492 (1973).

To determine whether statements are impermissible opinion testimony, a court will consider the circumstances of a case, including, "'(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" *State v. King*, 167 Wn.2d 324, 332-33 (2009) (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). During David Pettis' trial, the suspicions of family members entered through testimony of not only a family member but a law enforcement officer. The suspicions of a family member of guilt may be even more persuasive than the suspicions of a law enforcement officer. A daughter will not wish to wrongly implicate her father of murder. The nature of the charges was as serious as it comes.

The testimony of Elizabeth Culp and the law enforcement officer about the suspicions of Culp and other family members was also inadmissible because of its irrelevance. The State does not explain any relevance behind the testimony other than it prompted one officer to research life insurance. That officer could have simply testified that he reviewed the insurance policies on the life of Peggy Pettis. The reason for reviewing the policies did not help the jury in determining the guilt or innocence of David Pettis. Elizabeth Culp and family member's suspicions did not render it more likely that David Pettis murdered his wife.

20

The State contends that some of the challenged testimony explained what actions law enforcement took during its investigation of the death of Peggy Pettis. Nevertheless, the State fails to explain the relevance of any of the steps taken by law enforcement in its investigation. David Pettis' prosecution concerned only whether Pettis intentionally killed Peggy. The details, extent, and competency of the Spokane County Sheriff's Department's investigation did not render the guilt or innocence of Pettis more likely. The State could introduce statements uttered by David Pettis to law enforcement officers only because the statements could be an admission against interest, not because the statements were part of an investigation.

Generally, law enforcement's investigation lacks relevance to guilt or innocence of the accused. *State v. Edwards*, 131 Wn. App. 611, 614-15, 128 P.3d 621 (2006); *State v. Johnson*, 61 Wn. App. 539, 546-48, 811 P.2d 687 (1991); *State v. Aaron*, 57 Wn. App. 277, 279-81, 787 P.2d 949 (1990). Testimony as to what prompted police action is not necessarily relevant in a criminal prosecution. *State v. Lowrie*, 14 Wn. App. 408, 411-13, 542 P.2d 128 (1975).

In *State v. Edwards*, 131 Wn. App. 611, 614-15 (2006), a detective testified that he initiated his investigation of the defendant based on the statements of a confidential informant. In response to a hearsay objection, the State argued the testimony was not offered to prove the truth of the confidential informant's statement to the detective, but only to explain why the detective began to investigate that particular person. This court ruled the statement hearsay inadmissible because it was relevant only if offered for its

truth, since the detective's motive for starting his investigation was not an issue in controversy.

In *State v. Rocha*, 21 Wn. App. 2d 26, 31-33, 504 P.3d 233 (2022), this court reversed a conviction because of a law enforcement officer's testimony that officers responded to a report of domestic dispute between defendant and his father. The reason why the officers went to the scene was of no consequence at trial.

## Ineffective Assistance of Counsel

In the alternative to the argument that the State violated his right to a fair trial by inadmissible opinion testimony as to guilt, David Pettis contends his trial counsel performed ineffectively by failing to seek to exclude much of the inadmissible testimony. I agree. Pettis' trial counsel objectively performed unreasonably when failing to object to the mound of bad evidence that the State submitted.

The constitution guarantees effective assistance of counsel in order to ensure that a defendant receives due process because counsel helps ensure that the defendant presents a defense that furthers a fundamentally fair trial. *State v. Crow*, 8 Wn. App. 2d 480, 506-07, 438 P.3d 541 (2019). The Sixth Amendment to the United States Constitution and article I, section 22, of the Washington Constitution guarantee the right to assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). State decisions follow the teachings and rules announced in the United States Supreme Court's seminal decision of *Strickland v. Washington*, 466 U.S. 668 (1984). An accused is entitled to

more than a lawyer who sits next to him in court proceedings. In order to effectuate the purpose behind the constitutional protection, the accused is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). I address the prejudice prong when discussing harmless error.

For the deficiency prong of ineffective assistance of counsel, this court gives great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel was effective. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Deficient performance is performance that fell below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The appellant bears the burden to prove ineffective assistance of counsel. *State v. McFarland*, 127 Wn.2d 322, 335 (1995).

Courts cannot exhaustively define the obligations of counsel or form a checklist for judicial evaluation of attorney performance. *Strickland v. Washington*, 466 U.S. 668 (1984). Nevertheless, effective representation entails certain basic duties, such as the overarching duty to advocate the defendant's cause and the more particular duty to assert such skill and knowledge as will render the trial a reliable adversarial testing process.

*Strickland v. Washington*, 466 U.S. 668, 688-89 (1984); *In re Personal Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 99-100, 351 P.3d 138 (2015).

The State forwards the familiar mantra that a failure to object to the admission of evidence constituted a tactical decision of trial counsel and is not subject to questioning on appeal under the rubric of ineffective assistance of counsel. The defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct or omission by counsel. *State v. McFarland*, 127 Wn.2d 322, 336 (1995). Imposing the burden on the defendant invents problems since the imposition requires the defendant to prove a negative. Presumably the defendant must fashion straw men or women and then dissemble them. In practice, the State typically posits one or more reasons for a tactical decision. The Washington Supreme Court nonetheless remains firm that no presumption of ineffective representation exists. *State v. McFarland*, 127 Wn.2d 322, 336 (1995). Thus, in the end, the defendant holds the burden of showing a lack of a legitimate strategy.

Decisions on whether and when to object to trial testimony are classic examples of trial tactics. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007). Counsel engages in a legitimate trial tactic when forgoing an objection in circumstances when counsel wishes to avoid highlighting certain evidence. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

24

This latter rule makes no sense in light of the standard jury instructions that the jury must not consider evidence ruled inadmissible and not hold objections to evidence by counsel against a party. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02, at 20 (4th ed. 2016). In contexts favorable to the State, but not favorable to the accused, courts apply a presumption that the jury follows the court's instruction. *State v. Smith*, 144 Wn.2d 665, 679, 30 P.3d 1245 (2001).

When a defendant bases their ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007). I have already shown that the trial court should have sustained an objection to the much of Mark Voigtlaender's testimony.

This court routinely affirms criminal convictions against a claim of ineffective assistance of counsel on the basis that the claimed ineffective assistance involved trial strategy. Nevertheless, an argument that trial strategy informed trial counsel's performance does not end our inquiry. Not all defense counsel's strategies or tactics are immune from attack. *In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141, 385 P.3d 135 (2016). A criminal defendant can rebut the presumption of reasonable performance by demonstrating that no conceivable legitimate tactic explains counsel's performance. *In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141 (2016); *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Counsel performs deficiently by failing to object to inadmissible evidence absent a valid strategic reason. *State v.*

25

*Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998). The relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); *State v. Grier*, 171 Wn.2d 17, 34 (2011).

No reasonable trial strategy explains trial defense counsel's failure to object to the testimony of Mark Voigtlaender. Voigtlaender was not a qualified expert. He repeatedly proffered opinions in areas in which he lacked expertise and on which no opinion can testify. The argument that counsel did not wish to highlight the evidence by objecting before the jury holds no rain. Counsel could have and should have brought a motion before trial to exclude all opinion testimony, particularly the testimony given by Voigtlaender.

Counsel also performed ineffectively by failing to preclude the opinion testimony of Elizabeth Culp and David William Pettis. A motion in limine to preclude any opinion testimony would have also prevented the introduction of the evidence without the need to object before the jury.

## Harmless Error

At some point, the introduction of inordinate inadmissible and unfair evidence by the State should lead to a reversal no matter the weakness of the defense or no matter if the State might show harmless error. This appeal may be one such prosecution. But I need not rely on such a proposed remedy.

Although we disagree to its extent, the majority and I concur that constitutional error occurred. Appellate review presumes constitutional error to be prejudicial, and the State bears the burden of proving the error harmless. *State v. Stephens*, 93 Wn.2d 186, 190-91, 607 P.2d 304 (1980). We place a heavy burden on the State to show harmless error in order to (1) discourage conduct that undermines justice and (2) deter conduct repugnant to the concept of an impartial trial. *State v. Charlton*, 2 Wn.3d 421, 429, 538 P.3d 1289 (2023); *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

Washington courts reference two standards for adjudging constitutional harmless error. First, we must reverse unless we are persuaded, beyond a reasonable doubt, that the error did not affect the verdict. *State v. Charlton*, 2 Wn.3d 421, 428-29 (2023). This standard is called the "'contribution test.'" *State v. Johnson*, 100 Wn.2d 607, 621, 674 P.2d 145 (1983), *overruled on other grounds in State v. Bergeron*, 105 Wn.2d 1, 4, 711 P.2d 1000 (1985). Some decisions restate this first test as requiring the State to establish beyond a reasonable doubt that "any reasonable jury" would have still reached the same result absent the error. *State v. Quaale*, 182 Wn.2d 191, 201-02, 340 P.3d 213 (2014). An "any reasonable jury test" should be difficult to surmount because of the variances in views of reasonable people who sit as jurors.

In addition to declaring that the reviewing court must vacate a conviction unless it concludes beyond a reasonable doubt that the constitutional error did not influence the outcome of the trial, Washington courts employ an "'overwhelming evidence test.'" *State v. Johnson*, 100 Wn.2d 607, 621 (1983). Under the overwhelming evidence test,

27

constitutional error is harmless if the court adjudges beyond a reasonable doubt that the untainted evidence necessarily leads to a finding of guilt. *State v. Johnson*, 100 Wn.2d 607, 621 (1983).

In at least one decision, the Washington Supreme Court has determined the overwhelming evidence test to be the preferred test. *State v. Guloy*, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985). The Supreme Court still references the contribution test, however. *State v. Heng*, 2 Wn.3d 384, 395, 539 P.3d 13 (2023). No decision analyzes constitutional error both standards or suggests that the circumstances of the case or the nature of the error leads to a different result depending on which standard the court applies.

"Harmless error review requires close scrutiny of all the evidence." *State v. Romero-Ochoa*, 193 Wn.2d 341, 349, 440 P.3d 994 (2019). The court considers the totality of the evidence. *State v. Romero-Ochoa*, 193 Wn.2d 341, 349 (2019); *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983).

The harmless error analysis is fundamentally different from the sufficiency of evidence test. *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). The harmless error inquiry does not ask whether enough evidence supported the result, apart from the phase affected by the error. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The court instead asks whether the error had substantial influence. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). If so, or if

one is left in grave doubt, the conviction cannot stand. *Kotteakos v. United States*, 328

U.S. 750, 765 (1946).

Assessing evidence to be overwhelming and discerning beyond a reasonable doubt

whether inadmissible evidence contributed to a verdict is a difficult and imprecise task in

many, but not all, cases and poses struggles in David Pettis' appeal. Appellate judges

frequently apply constitutional harmless error analysis and give little thought to the

meaning of "overwhelming evidence." We have no measuring stick to distinguish

between overwhelming evidence and nonoverwhelming evidence. We do not even have

a name for nonoverwhelming evidence. The United States Supreme Court and the

Washington Supreme Court have announced few guidelines for a reviewing court to

employ when assessing what constitutes overwhelming evidence, on the one hand, or

evidence that could impact a verdict, on the other hand.

Constitutional harmless error creates anomalies in difficult circumstances such as

created by David Pettis' appeal. When assessing the impact of error, a reviewing court

plays a role as an enriched jury, rather than a panel of judges discerning and applying the

law. Principles of review suggests that we insert ourselves into the skin of a layperson

juror with no experience in adjudicating guilt or innocence and with no familiarity with

the judicial system. But judges think differently from jurors. For instance, we maintain

our status as veteran adjudicators with differing degrees of cynicism about the testimony

of witnesses and stories forwarded by an accused.

The overwhelming evidence test fails to recognize the conundrum of a jury's difficulty in reaching a decision as to whether the State's evidence supports a conviction beyond a reasonable doubt. The contribution test ignores the process of twelve ordinary persons, all with unique insight, discussing the evidence in minute detail before reaching a verdict. Both tests disregard the phenomenon that overwhelming evidence to one juror could comprise negligible evidence to another juror. For purposes of David Pettis' appeal, the State may have presented overwhelming evidence at trial, but one juror still convicted Pettis only because of opinions of guilt uttered by Pettis family members and law enforcement officers.

I now evaluate the State's evidence presented against David Pettis. In doing so, I must remember that David Pettis need not have established an innocent explanation for the cause of Peggy's death in order to successfully defend the prosecution. Pettis had no burden of showing the method of Peggy's death. The State carried the burden to show that, with premeditation, Pettis intended to kill his wife and successfully did so.

The majority writes that the only issue at trial was whether David Pettis ground up the hydrocodone and placed it in Peggy's drink. Not true. Even if David Pettis did so, he may not have done so to kill Peggy. Pettis grinding up one or more hydrocodone for Peggy does not equate to intending her death.

In analyzing harmless error in the context of unblemished evidence, I must view all inadmissible testimony spoken by Mark Voigtlaender, Elizabeth Culp, and David William Pettis as constitutionality tainted under both the right to a fair trial and the right

30

to assistance of counsel. The testimony of Culp as to suspicions and David William as to his father's participation expressed an opinion of guilt. The State tied the challenged testimony from Voigtlaender to his theme of "Pathway To Premeditation" and to his opinion of guilt. Counsel's failure to object to all of this testimony formed ineffective assistance of counsel.

The State downplays the slide introducing the theme of "Pathway To Premeditation" because Mark Voigtlaender and the State's attorney never uttered the phrase "pathway to premeditation." This belittling of the evidence fails to recognize the assessment of communication experts that jurors remember slides in a PowerPoint presentation before remembering spoken words. Humans are visually orientated, so visual representations reinforce key points, and the listener more easily retains the information. The depreciating of the slide by the State also ignores the fact that Voigtlaender's testimony was not merely designed to summarize extensive documents but to advocate that the communications of David Pettis, Peggy, and Robin proved the theme of a pathway to premeditated murder. The inopportune opinion testimony wrapped itself around the slide. If the slide was unimportant, as suggested by the State, the State would have never shown it to the jury.

The State also pooh-poohs David William's testimony that he came to believe his father participated in his mother's death by characterizing the testimony as fleeting. This downplay disregards the added opinion of Mark Voigtlaender and Elizabeth Culp's testimony that she and other family members possessed suspicions. This deprecation of

31

the testimony also fails to note the strong impact of an accused's family member telling a jury that he considers his father guilty of first degree murder. This court, in *State v. Johnson*, 152 Wn. App. 924, 219 P.3d 958 (2009), and *State v. Lahti*, 23 Wn. App. 648, 597 P.2d 937 (1979), recognized the irrelevance and overwhelmingly prejudicial nature of a family member's suspicions that the accused committed a horrendous crime.

I continue with an assay of whether the State presented overwhelming evidence of guilt. The State used to its advantage David Pettis' untoward extramarital, partly physical, but principally idealistic and imaginary, affair with Robin. The evidence painted Pettis as an immoral, conniving husband wanting to end his wife's life to carry on a relationship with his childhood sweetheart. When emphasizing this evidence, the State ignores David Pettis' testimony, Elizabeth Culp's testimony, and even Robin's testimony that Peggy knew of the relationship and registered approval to Robin. Peggy told Elizabeth Culp, her daughter, that she was thankful that Robin could care for her father if she died. Although such approval by a wife is atypical, this reviewing court should not reject this fact. Human beings do strange things and think odd thoughts.

Assuming Peggy was upset with the relationship David Pettis sought to nurse with Robin, Peggy could have committed suicide as a result of unhappiness and abandonment rather than Pettis poisoning her. Peggy's sister, Melissa Mabe, testified that she saw Peggy the morning of her death and Peggy "seemed off . . . she was just off." 1 RP (Dec. 1, 2022) at 294. Housemate Nancy Porter testified that Peggy developed a somber mood in the days preceding her death. This testimony confirms the possibility of suicide

32

even though witnesses testified that Peggy was not the type to commit suicide. After most suicides, one or more persons typically comment that the decedent was not the type to commit suicide. Even David Pettis, to his own disadvantage, stated Peggy would not commit suicide.

The State highlights the purchase of life insurance on Peggy's life immediately before her death and emphasizes a motive to kill Peggy for the insurance proceeds. This underscoring of evidence discounts other evidence that Peggy was integrally involved in the purchase of the insurance and that she, in addition to Pettis, hurried the process. According to Krystn Meier, the Pettises' life insurance agent, Peggy was proactive in procuring a policy by going to the doctor's office and getting additional documentation. Also, according to Meier, the couple sought insurance on David's life. With the counsel of Meier, the two decided not to apply for a policy on David Pettis' life because of his medical condition. He might have been able to purchase life insurance but only at an excessive rate.

In its review of the evidence, the State emphasizes financial difficulties encountered by David and Peggy Pettis. The State forgets that the Pettises had a comfortable income that allowed them to be generous to many people.

The State highlights that David Pettis never awakened Nancy and William Porter when he found Peggy collapsed on the floor. Sound reasons other than murder explain the lack of immediate notice to the Porters. For example, Pettis may not have wished the Porters to interfere in the care of Peggy by emergency medical providers. Pettis was

33

distraught and may have been in a hurry to get professional help and did not think about the Porters.

The State stresses changes in stories told by David Pettis surrounding the demise of Peggy. I agree that Pettis told different stories to different people, but sometimes a person does so innocently, particularly during the stress of a death of a loved one and because of remembering events differently as time passes. Pettis could have changed the story, not because of guilt, but in attempt to convince others of his innocence.

According to the majority, the State's analyst opined that some messages sent from Peggy's account to Robin were written by Pettis. This testimony was speculation. We do not know for sure who authored the messages sent from Peggy's accounts. No percipient testimony addressed authorship.

Many facts suggest that David Pettis did not kill his wife. David William Pettis testified that his mother and father were committed to remaining together. Elizabeth Culp echoed her brother's testimony when declaring her parents wanted to maintain a strong relationship. According to Culp, her mother maintained a friendship with Robin. Nancy Porter, who lived in the same house as the Pettises, never saw or heard David mistreat Peggy.

Evidence established that Peggy suffered chronic pain and frequently used hydrocodone for the pain. Peggy had accumulated a stash of hydrocodone on her own. Nancy Porter testified that, when retiring to bed, Peggy took hydrocodone if her leg hurt.

Other witnesses testified to Peggy grinding up her pills and placing the powder in ice cream.

Regardless of no dementia, Peggy could have forgotten she had earlier taken some hydrocodone and took more such that a lethal dose accumulated in her stream. John Howard, the forensic pathologist and medical examiner, testified that Peggy could have taken the hydrocodone on her own volition.

The toxicologist found trazodone, a sleep aid, and cyclobenzaprine, a muscle relaxant, in the bloodstream of Peggy Pettis. A physician prescribed the medications for David, not Peggy. Nevertheless, Peggy could have garnered access to the pills. We have no evidence that David Pettis was sophisticated enough to believe a combination of the pills would cause death.

When law enforcement asked Pettis about searches on his computer for the effects of hydrocodone, Pettis indicated that Peggy entered the search. We do not know otherwise.

The medical examiner confirmed David Pettis' story that Peggy aspirated, although the examiner testified that aspiration is typical at the time of death and was not the cause of Peggy's death. The examiner could not opine as to how many hydrocodone pills Peggy took or whether she unknowing or knowingly took the pills.

The State's and the majority's evaluation of evidence disregards strong testimony of the couple's daughter, Elizabeth Culp, who considered her mother her best friend and who testified favorably for her father. Culp, who lived with her parents several years

35

earlier, testified to her mother maintaining a large stash of hydrocodone. Her mother took hydrocodone for pain although she did not know the full extent of the mother's use of drugs because of the mother's desire for privacy. According to Culp, Peggy ground the pills in a grinder and placed the powder in food or drink because of a difficulty in swallowing pills. According to Culp, her parents hurried to procure insurance on Peggy's life before she turned 64 and one-half years of age. Peggy occasionally choked on water.

The State emphasizes that Elizabeth Culp, when testifying, possessed the motive of exaggerating in order to save her only remaining parent from prison. But when this court applies the constitutional harmlessness beyond a reasonable doubt standard, this court should not weigh the evidence. The jury could have believed all of the testimony of Culp, but for the inadmissible and harmful testimony.

This court should also assume that, without the unconstitutional evidence, the jury would have believed the testimony of David Pettis presented through the playing of his interview by law enforcement. Pettis testified that Peggy ground the hydrocodone, and he did not kill his wife.

A reviewing court should not weigh the credibility of witnesses when analyzing harmless error. *State v. Jackson*, 252 Or. App. 74, 82, 284 P.3d 1266 (2012); *Lumpkin v. State*, 245 Ga. App. 627, 629, 538 S.E.2d 514 (2000); *Pearson v. State*, 216 Ga. App. 333, 334, 454 S.E.2d 205 (1995). I would impose two exceptions to the rule when the testimony of a witness is entirely implausible rather than believable and when cross-

examination of the defendant destroys his credibility. But the testimony of both

Elizabeth Culp and David Pettis bore earmarks of plausibility.

Spokane County Sheriff's Office's employee Mark Voigtlaender bespoke most

of the inadmissible evidence in David Pettis' trial. In *City of Seattle v. Levesque*, 12 Wn.

App. 2d 687, 710-11, 460 P.3d 205 (2020) and in *State v. Demery*, 144 Wn.2d 753,

761-62, 30 P.3d 1278 (2001) (plurality opinion), this court and the state Supreme Court

respectively emphasized that an officer's testimony offered during trial, like a

prosecutor's statements uttered during summation, carries an aura of special reliability

and trustworthiness. The officer's testimony will profoundly influence a jury. For this

reason, among other reasons, this court in *Levesque* held the officer's inadmissible

testimony was not harmless error.

Other Washington decisions support my conclusion that the State did not show

harmless error beyond a reasonable doubt in part because of the undue influence of a law

enforcement officer's opinion of guilt. In *State v. Farr-Lenzini*, 93 Wn. App. 453 (1999),

this court adjudged the state trooper's testimony as to the accused's state of mind harmful

under either the overwhelming evidence or contribution test. This court noted that the

trooper's testimony addressed the critical core issue. The testimony also implicated the

accused's credibility. We also recognized that testimony of a law enforcement officer as

to an accused's guilt particularly influences the jury.

In *State v. Barr*, 123 Wn. App. 373, 98 P.3d 518 (2004), a law enforcement officer

testified that defendant Derrick Barr lied when denying allegations against him. This

37

court reversed the conviction, while recognizing the influence of a government official on a jury. In *City of Vancouver v. Kaufman*, 10 Wn. App. 2d 747, 450 P.3d 196 (2019), this court reversed a conviction for the same reason.

David Pettis' trial suffered from numerous critical errors. The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even when any one of the errors, taken individually, would be harmless. *In re Personal Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). When, under the totality of the circumstances, it is shown that the accumulation of errors substantially prejudiced the defendant and denied him a fair trial, reversal is required. *In re Personal Restraint of Cross*, 180 Wn.2d 664, 690 (2014). Under the cumulative error doctrine, an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process. *State v. Samuel*, 165 Idaho 746, 778, 452 P.3d 768 (2019).

A court should be reluctant, rather than quick or even casual, when declaring harmless error in favor of the State. Our American judicial system suffers from many wrongful convictions. When a court applies harmless error, we reward the State's breach of valued constitutional rights of the accused. We encourage the State to continue to present irrelevant, speculative, and unduly prejudicial evidence in order to convict. We also endorse the directions from some prosecuting attorney office superiors to State trial

attorneys "to get into evidence whatever you can get in and let the appellate lawyer worry about affirming the verdict."

At a bench trial, I might have convicted David Pettis of murder based on the untainted evidence. But I cannot be certain. The State's case is circumstantial. Significant evidence mitigates against the guilt of Pettis. Because the State must prove harmless error beyond a reasonable doubt, I must give Pettis the benefit of the doubt. I conclude some reasonable juries, although not necessarily all juries, would acquit Pettis. I am not persuaded beyond a reasonable doubt that the constitutional error did not impact the verdict.

_____Fearing, J._____

Fearing, J.